UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony ACCETTURO, Robert S. Basha,
Raymond J. Basha, Michael V. Monahan, Defendants–Appellants.

No. 90–3681.

United States Court of Appeals,
Eleventh Circuit.

July 20, 1992.

Peter D. Aiken, Ft. Lauderdale, Fla., for Anthony Accetturo.

F. Lee Bailey, Paul M. Rashkind, Bailey, Gerstein, Carhart, Rashkind, Dresnick & Rippingille, Miami, Fla., for Robert S. Basha and Raymond J. Basha.

Daniel M. Hernandez, Tampa, Fla., for Michael V. Monahan.

Frank J. Marine, Civil Div. Litigation Unit, U.S. Dept. of Justice, Organized Crime, Maria Cassalia Kersten, Washington, D.C., for U.S.

Before ANDERSON, Circuit Judge, HILL, Senior Circuit Judge, and YOUNG,* Senior District Judge.

ANDERSON, Circuit Judge:

Appellants, Anthony Accetturo, Jr., Robert Basha, Raymond Basha, and Michael Monahan, were convicted of conspiracy to collect extensions of credit by extortionate means and collecting extensions of credit by extortionate means, in violation of 18 U.S.C. §§ 894 and 2. For the reasons that follow, we affirm their convictions.

## I. BACKGROUND

A. *The Relevant Facts*

Government witnesses testified that on August 11, 1989, Chris Loiselle signed an agreement with Robert and Raymond Basha, in which he borrowed $40,000 for 45 days, agreeing to repay $60,000. Loiselle left town without repaying the loan. In late September 1989, Robert Basha called Kelly Wade, Loiselle's secretary, to inquire into his whereabouts. Robert had discovered a note on Loiselle's door to "Scott," stating that Loiselle had gone to "the Keys." Wade told Robert that the only Scott she knew was Scott Stockholm.

On September 26, 1989, Robert Basha and Michael Monahan went to Stockholm's apartment in Hollywood, Florida to ask about Loiselle. After Monahan began hitting Stockholm, Stockholm told them that he knew where Loiselle was. Stockholm telephoned Loiselle and talked to him briefly. Robert called an individual named "Zap," who came over and insisted that Stockholm take them to Loiselle. Stockholm drove with Robert and Monahan to Loiselle's mother's home in Largo, Florida.

Stockholm knocked on the door; when Loiselle answered, Stockholm told him that two men wanted to see him. Robert and Monahan forced Stockholm and Loiselle to accompany them back to Fort Lauderdale. In the car, Monahan berated Loiselle for leaving town without notifying them. The men returned Stockholm to his apartment and left with Loiselle.

On September 29, 1989, Loiselle gave a statement to Detective John L. Carroll of the Largo Police Department. We summarize Loiselle's statement as follows. Loiselle's business had been having financial problems; he had borrowed money to keep the office running. He met with Robert and Raymond Basha, who agreed to lend him $40,000 for 45 days. After Loiselle's company's financial situation worsened, he moved to his mother's house in Largo, Florida without contacting the Bashas. At about 8:30 p.m. on Tuesday evening, he received a brief telephone call from Scott Stockholm. Loiselle later tried to call Stockholm back but was unable to reach him. About 2:30 a.m., he was awakened by Stockholm's knock on the door. Robert Basha and Monahan took Loiselle and Stockholm in the car to Hollywood, Florida, where they dropped Stockholm off. Robert and Monahan drove Loiselle to Monahan's apartment, and then had Robert's girlfriend drive him to R & R Jet Tech (the Bashas' business). After Loiselle explained the circumstances of his leaving town to the Bashas, they told him that he would have to answer to the people who gave them the money. A heavy-set, short man with a blue cap and large gold necklace smached Loiselle's face with his hand, and said that he would put Loiselle in the ground if Loiselle did not "get ahold of" the money. The man, who Loiselle thought was named Eddy, said that if he had to see Loiselle again he would put him in the ground, and that he would be the last person Loiselle saw. Loiselle's statement ended with the words, "If I am missing again,

---

* Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

this should explain where or what has happened to me."

Loiselle agreed to cooperate with the police. Subsequently, several of his conversations with the Bashas were recorded. Undercover agents posed as mobsters who had agreed to pay off Loiselle's loan. The agents met with Robert Basha at the St. Petersburg–Clearwater airport, and asked to meet the person whose money had been loaned to Loiselle. At approximately 10:30 that evening, Loiselle, Agent Sanz, and Agent Caso observed appellants' aircraft land, taxi, and come to a stop. They observed at least three persons disembark from the aircraft. Pointing to appellant Accetturo, Loiselle stated to Agent Sanz, "That's Tony." Agent Sanz asked, "Is that Tony?" Loiselle replied, "Yes." Agent Sanz then inquired, "Are you sure?" and Loiselle replied, "Yes." Agent Sanz then asked him if that was the one that slapped him, and Loiselle replied, "Yes."

Accetturo, who was accompanied by Robert and Raymond Basha, told the agents that the money that Loiselle had borrowed was his money. The agents negotiated a price of $55,000 for the loan with Accetturo and the Bashas. The three were then arrested.

### B. *Proceedings Below*

On November 15, 1989, the grand jury returned a five-count indictment charging appellants as follows: Count 1, conspiracy to participate in the affairs of an enterprise through collection of an unlawful debt, in violation of 18 U.S.C. § 1962(d), with a forfeiture claim against the Bashas and R & R Jet Tech, pursuant to 18 U.S.C. § 1963(a)(2)(D); Count 2, conspiracy to collect extensions of credit by extortionate means, in violation of 18 U.S.C. § 894;

Count 3, collecting extensions of credit by extortionate means, in violation of 18 U.S.C. §§ 894 and 2; Count 4, violent crimes in aid of racketeering, in violation of 18 U.S.C. §§ 1959 and 2; and Count 5, violent crimes in aid of racketeering, in violation of 18 U.S.C. §§ 1959 and 2.

Two days before the jury trial was to begin, Loiselle disappeared.[1] The government filed a Motion to Admit Evidence Pursuant to Rule 804(b)(5) of the Federal Rules of Evidence, seeking to admit into evidence Loiselle's written statement and the oral identification of Accetturo he had given to Agent Sanz at the airport. After an evidentiary hearing, the district court granted the government's motion. At trial, the statements were admitted over appellants' objection. Appellants were each convicted on Counts 2 and 3 of the indictment.[2] This appeal followed.

## II. DISCUSSION

### A. *The Confrontation Clause Claim*

Appellants argue that the district court abused its discretion and violated the Confrontation Clause by admitting Loiselle's written statement to the police pursuant to Fed.R.Evid. 804(b)(5), a residual hearsay exception.[3] They claim that under *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990),[4] it was error for the court to consider independent corroborating evidence which tended to prove that Loiselle's statement was true. They argue that the only corroborating evidence which could be considered were circumstances surrounding the making of the statement that rendered the declarant particularly worthy of belief, and that these indicia of

---

1. Loiselle was found murdered five days later.

2. Accetturo and Raymond Basha were acquitted of Count 4; a mistrial was declared on Counts 1 and 5 as to each defendant, and on Count 4 as to Robert Basha and Monahan. The government dismissed the counts that had resulted in mistrial.

3. The district court held that Loiselle's oral statement was admissible pursuant to both Fed.

R.Evid. 804(b)(5) and 803(1). We find that the court did not abuse its discretion in admitting the oral statement pursuant to 803(1). Because the oral statement was properly admitted under 803(1), we do not discuss its admissibility under 804(b)(5). The text of this opinion, therefore, focuses only on Loiselle's written statement to the police.

4. *Idaho v. Wright* was decided two months after appellants' trial ended.

reliability were insufficient to justify admitting the statement.

In *Idaho v. Wright,* the Supreme Court considered whether a state trial court's decision to admit hearsay into evidence violated the defendant's rights under the Confrontation Clause of the Sixth Amendment. In that case, a two and a half year old child had made statements regarding sexual abuse to a pediatrician. The trial court decided that the child was not able to communicate with the jury, and allowed the doctor to testify about what she had told him. The court admitted the statements under Idaho's residual hearsay exception, which tracks Fed.R.Evid. 803(24).[5]

In affirming the Idaho Supreme Court's reversal of the conviction, the Court held that the Confrontation Clause requires that once a witness is shown to be unavailable,[6] "his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at ——, 110 S.Ct. at 3146, *quoting Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Because Idaho's residual hearsay exception is not "firmly rooted," the Court examined the "trustworthiness" requirement. The Court held that a finding of trustworthiness must be based on a consideration of the totality of the circumstances, but that "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* 497 U.S. at ——, 110 S.Ct. at 3148. The standard is whether "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal

utility." *Id.* at ——, 110 S.Ct. at 3149. Thus, the Court held that a trial court may not consider independent corroborating evidence in judging the admissibility of a hearsay statement sought to be admitted pursuant to a residual hearsay exception. *Id.* at ——, 110 S.Ct. at 3050–51.

■ At the pretrial evidentiary hearing, the district court relied on independent corroborating evidence in deciding to admit Loiselle's statement. The Supreme Court has now stated unequivocally that independent corroborating evidence may not be used to evaluate the admissibility of hearsay evidence which the government seeks to have admitted pursuant to a residual hearsay exception. Thus, we must decide whether, if the corroborating evidence is not considered, there were adequate guarantees of trustworthiness to justify admitting Loiselle's statement under Fed.R.Evid. 804(b)(5).

The correct application of *Idaho v. Wright* to the determination of the admissibility of hearsay pursuant to a residual hearsay exception is a question of first impression in this circuit. Accordingly, we look to the circuits that have addressed the issue for guidance. In *United States v. Ellis,* 951 F.2d 580 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3030, 120 L.Ed.2d 901 (1992), the Fourth Circuit held that the hearsay statements of a deceased witness were admissible. The witness, Samuel D'Annunzio, was a West Virginia lobbyist who had assisted the defendant, William Ellis, in his efforts to assure passage of a bill in the state legislature through illegal means. D'Annunzio, who had entered into a plea agreement with the federal government, cooperated with government agents, describing the methods used to further the illegal scheme and secretly recording conversations with Ellis

---

**5.** Under Fed.R.Evid. 803, the availability of the declarant is immaterial. Under Fed.R.Evid. 804, the declarant must be unavailable. Otherwise, Fed.R.Evid. 803(24) and 804(b)(5) are identical.

**6.** In *White v. Illinois,* —— U.S. ——, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the Supreme Court held that the Confrontation Clause does not

require that the declarant be unavailable, at least when the hearsay is admitted under the "spontaneous declaration" or "medical examination" exceptions to the hearsay rule. The *White* decision does not affect *Idaho v. Wright's* applicability to this case; Loiselle's unavailability is not at issue.

and other participants. During the investigation, D'Annunzio committed suicide.

Ellis's trial took place shortly before *Idaho v. Wright* was decided; the district court relied on the kind of independent corroborating evidence that *Wright* later held to be irrelevant. In affirming the conviction, the *Ellis* court found several circumstances surrounding the giving of the statements that made them particularly worthy of belief. D'Annunzio issued the statements voluntarily, in the presence of both police officers and his attorneys. The statements were made in accordance with a plea agreement which required him to be truthful with federal investigators. The government agents took notes as D'Annunzio spoke. D'Annunzio knew that his statements would be investigated further. Finally, D'Annunzio agreed to record conversations with those he had implicated, suggesting that he was willing to have the truthfulness of his statements tested. *Id.* at 583. *But see United States v. Gomez–Lemos*, 939 F.2d 326 (6th Cir.1991) (grand jury testimony of unavailable co-conspirator, given in accordance with plea agreement, held inadmissible under *Idaho v. Wright* ).

In this case the indicia of reliability are considerably stronger than in the *Ellis* case.[7] Loiselle's statement was written in his own handwriting, on a form which attested to its truth.[8] Loiselle made the statement voluntarily, after voluntarily coming to the police station in response to a call from the Largo Police Department. The statement was given to law enforcement authorities, who Loiselle knew would most likely investigate further. Like D'Annunzio, Loiselle agreed to record his conversations with the men he had implicated, further indicating that Loiselle knew that the veracity of his story would be tested. The statement's narrative form indicates that Loiselle was not responding to leading questions or undue police influence. Because Loiselle was the victim of the crimes he described, he had ample opportunity to witness first-hand the events in his statement; because only two days had passed they were fresh in his mind. Most important, there was very strong evidence that Loiselle feared for his life; he would have had no incentive to manufacture a statement that would cause an investigation and alert the defendants that he had gone to the police.[9]

---

7. The indicia of reliability in this case are also as strong or stronger than in other cases which have affirmed convictions under *Idaho v. Wright*. *See McCafferty v. Leapley*, 944 F.2d 445 (8th Cir.1991) (statements of child sexual abuse victim admitted; statements were explicit, consistent, uncharacteristic for child of victim's age and level of development, recorded, spontaneous or in response to nonleading questions, and victim had no motive to lie), *cert. denied,* —— U.S. ——, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992); *United States v. Ellis*, 935 F.2d 385 (1st Cir.) (testimony regarding child sexual abuse victim's gestures using anatomically correct dolls admitted; social worker asked virtually no questions but merely gave child the dolls to play with), *cert. denied,* —— U.S. ——, 112 S.Ct. 201, 116 L.Ed.2d 160 (1991). The evidence of reliability in this case is much stronger than in *United States v. Gomez–Lemos*, 939 F.2d 326 (6th Cir.1991), in which the court applied *Idaho v. Wright* and held a co-conspirator's hearsay statement inadmissible. Unlike *Gomez–Lemos*, this case did not involve the statement of a co-conspirator, who would have a motive to implicate others in hopes of exonerating himself or receiving more favorable treatment from the government. *See also Sherley v. Seabold*, 929 F.2d 272 (6th Cir.1991) (statement of 82–year-

old victim, who suffered from memory loss before being robbed and beaten, and whose condition was so much worsened after the attack that she had to be placed in a nursing home, held inadmissible).

8. The form contained the following language:
   "Before me personally appeared *Chris Loiselle*, who being duly sworn, attests to the truth of his/her statements.
   Sworn to and subscribed before me this *29* day of *Sept,* A.D. *1989.*
   *John Carroll*
   Taken in my capacity as a law enforcement officer as defined in 943.10 F.S. with *Largo* Police Department and on authority of 925.-095 F.S."
   Detective John Carroll of the Largo Police Department filled in the blanks and signed the form.

9. Cases from other circuits indicate that the lack of a motive to lie and the absence of leading questions are important factors to consider. *See, e.g., United States v. George*, 960 F.2d 97 (9th Cir.1992); *Dana v. Department of Corrections*, 958 F.2d 237 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 3043, 120 L.Ed.2d 911

There was also some contrary evidence; there were some indications that Loiselle's statement was not trustworthy. Several witnesses testified that Loiselle had a poor reputation for truthfulness; he had also engaged in fraudulent financial transactions in the past. Robert Brindley, a former friend of Loiselle's, provided some evidence of a motive to fabricate the kidnapping story: to relieve Loiselle of his obligation to repay the usurious loan. Finally, Loiselle's business financial problems could have provided a motive to defraud his creditors.

After carefully weighing the relevant circumstances surrounding the making of Loiselle's statement, we conclude that the indicia of reliability are strong enough to overcome the presumption against the admissibility of hearsay evidence pursuant to a residual hearsay exception. In particular, we are influenced by the compelling evidence of Loiselle's fear. In light of that evidence, we conclude that it is highly unlikely that Loiselle would have told the police that he had been kidnapped, thereby incurring the risk of the defendants' wrath, unless it were true. Loiselle had to know that the inevitable investigation of his kidnapping story would alert the defendants to the fact that Loiselle had informed on them. We conclude that the evidence that Loiselle had no motive to fabricate the story overwhelms the weak evidence of a motive to fabricate.

For the foregoing reasons, we conclude that the district court committed no error in admitting Loiselle's written statement.

### B. The Government's Failure to Disclose Loiselle's Entire Statement

■ After Loiselle's statement was read into evidence, appellants realized that their copies did not contain the last two lines:

"If I am found missing again, this should explain where or what has happened to me." Appellants objected and moved for a mistrial or other corrective measures.[10] The district court instructed the jury that the last two lines were to be considered only as they related to Loiselle's state of mind—his belief that failure to repay the loan would result in violence or danger to him. Also, the prosecutor was not allowed to argue about Loiselle's death in summation.

■ Fed.R.Crim.P. 16 provides in pertinent part:

(a)(1)(C) Documents and Tangible Objects.

Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, . . . which are within the possession, custody, or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial. . . .

Even if inadvertent,[11] the government's failure to provide appellants with Loiselle's entire written statement violated Rule 16. However, a discovery violation does not automatically preclude the government's use of the evidence at trial. *United States v. Rodriguez,* 799 F.2d 649, 652 (11th Cir. 1986). Relief for violations of discovery rules lies within the discretion of the trial court; a defendant must show prejudice to substantial rights to warrant reversal of that discretion. *Id.* In this case, the appellants have made no showing of prejudice; they have not suggested how they could have rebutted the evidence more effectively had they known about it sooner.

(1992); *McCafferty v. Leapley,* 944 F.2d 445 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992); *United States v. Ellis,* 935 F.2d 385 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 201, 116 L.Ed.2d 160 (1991).

**10.** Appellants suggested that the judge reconsider his decision to instruct the jury that Loiselle was dead, excise the last two lines from the statement, not send the statement back with the jury during deliberations, or admit polygraph evidence tending to show that the Bashas were not responsible for Loiselle's death. All of these motions were denied.

**11.** There is no evidence that the government's failure to provide appellants with the last two lines of the statement was intentional.

We conclude that the measures taken by the district court were adequate to protect the appellants' rights. The court limited the jury's consideration of the omitted lines to proof of Loiselle's state of mind; the prosecution was not allowed to argue that Loiselle was dead in closing argument, or to suggest any inferences to be drawn from his death. These safeguards were sufficient.[12]

### C. The District Court's Jury Instruction that Loiselle was Dead

■ Appellants contend that the district court erred when it informed the jury that Loiselle was dead, because the instruction's relevance was substantially outweighed by unfair prejudice to the appellants. We disagree. The district court advised the jury that "no inference whatsoever shall be drawn by you, adverse to either side in this case because of his death." The fact that Loiselle had died was relevant to explain the fact that Loiselle did not testify. Had the jury not been told, they might well have incorrectly concluded that Loiselle was incarcerated or was afraid to testify, fearing the impeaching cross-examination that the defense obviously would have mounted. We conclude that the instruction given was not an abuse of discretion.

AFFIRMED.[13]

---

**12.** Appellants also argue that the notice requirement in Fed.R.Evid. 804(b)(5) mandates rigid compliance, so that a trial court is precluded from admitting evidence that is not furnished to the opposing party before trial. Assuming *arguendo* that this is true, we find that the omitted lines were properly admitted pursuant to Fed. R.Evid. 803(3), which authorizes the admission of statements of the declarant's then existing state of mind.

**13.** Raymond Basha and Michael Monahan also challenge the sufficiency of the evidence to support their convictions. Their arguments are without merit and warrant no discussion. Likewise, Accetturo's contention that the district court erred by enhancing his sentence four levels for abduction, and two levels for his role as an organizer or leader, is without merit and warrants no discussion.