John F. RYAN and Jerome
Trigg, III, Appellants,

v.

STATE of Alaska, Appellee.

Nos. A–5181, A–5251.

Court of Appeals of Alaska.

July 14, 1995.

H. Conner Thomas, Larson, Timbers & Van Winkle, Inc., Nome, for appellant Ryan.

Sharon Barr, Asst. Public Advocate, and Brant G. McGee, Public Advocate, Anchorage, for appellant Trigg.

James L. Hanley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

John F. Ryan and Jerome Trigg, III, appeal their convictions for second-degree sexual assault, AS 11.41.420(a). The victim of the assault, M.K., committed suicide a few hours before she was scheduled to testify at grand jury. The State nevertheless secured indictments against Ryan and Trigg, in large measure through the testimony of Nome Police Officer Kevin Michels. Officer Michels described the accounts of the assault that M.K. had given him in two separate interviews.

Before trial, Ryan and Trigg challenged the admissibility of this hearsay evidence; they argued that their indictments should be thrown out, and they asked the superior court to preclude the State from presenting this evidence at trial. However, Superior Court Judge Michael I. Jeffery ruled that M.K.'s statements to the police were admissible under Alaska Evidence Rule 804(b)(5), one of Alaska's two "residual" hearsay exceptions.

Following Judge Jeffery's decision that M.K.'s police interviews were admissible against the defendants, Ryan entered a *Cooksey* plea to the sexual assault charge, preserving this evidentiary issue for appeal. *Cooksey v. State*, 524 P.2d 1251, 1255–57 (Alaska 1974). As part of the plea bargain, Ryan agreed to testify against Trigg. Trigg went to trial and was convicted.

Now, Ryan and Trigg renew their challenges to the admission of M.K.'s statements to the police. As will be explained below, we dismiss Ryan's appeal for lack of jurisdiction. However, in Trigg's appeal, we hold that M.K.'s statements were inadmissible hearsay.

**The Hearsay Rule and the Role of the Residual Exceptions Codified in Alaska Evidence Rules 803(23) and 804(b)(5)**

██ The hearsay rule prohibits a witness from testifying about statements made by someone else if this testimony is being offered to prove that what the other person asserted is true. *See* Alaska Evidence Rule 801(a)–(c). In the present case, a police officer was permitted to testify that (1) M.K. said she had been sexually assaulted by two men and (2) later, in a line-up, M.K. identified these men as Ryan and Trigg. This testimony was hearsay. Unless the testimony fell within an exception to the hearsay rule, it could not be used against Ryan or Trigg (over their objection).

"The theory of the hearsay rule is that the many possible deficiencies, suppressions, [and other] sources of error and untrustworthiness[ ] which lie underneath the ... untested assertion of a witness [ ] may be best brought to light and exposed by the test of cross-examination." John H. Wigmore, *Evidence* (Chadbourn rev'n 1974), § 1362, Vol. 5, p. 3. Or, as stated by Chief Judge Kent in *Coleman v. Southwick*, 9 Johns. 45, 50 (N.Y. 1812),

> Hearsay testimony is from the very nature of it attended with ... doubts and difficulties[.] A person who relates a hearsay [account] is not obliged to enter into any particulars, to answer any questions, to solve any difficulties, to reconcile any contradictions, to explain any obscurities, [or] to remove any ambiguities; he entrenches himself in the simple assertion that he was told so, and leaves the burden [of explanation] entirely on his dead or absent author.

(Quoted in *Wigmore*, § 1362, Vol. 5, pp. 6–7.)

██ By definition, when hearsay testimony is introduced, the person who actually made the hearsay statements is not subjected to adverse questioning—questioning that might reveal potential inaccuracies in the speaker's perception of the events being described, or that might reveal the speaker's potential motives to misrepresent or color his or her description of what happened. For this reason, the law distrusts hearsay, allowing it only when the circumstances of the utterance and/or the motivation of the speaker affirmatively demonstrate good reason to credit the out-of-court statement.

Various exceptions to the hearsay rule are codified in Alaska Evidence Rules 801(d), 803, and 804.[1] For the most part, these codified exceptions either come directly from the common law or are variations on the exceptions recognized at common law. As the Alaska Supreme Court has observed,

> The traditional exceptions to the hearsay rule form two general classes: (1) those statements which are so inherently reliable that cross-examination is thought unnecessary (Rule 803); and (2) those statements which are sufficiently reliable to be admitted in light of their great evidentiary value when the declarant is unavailable (Rule 804).

*Matter of A.S.W.,* 834 P.2d 801, 804 (Alaska 1992).

In addition to these traditional exceptions, both Evidence Rule 803 and Evidence Rule 804(b) contain "residual" clauses that authorize courts to allow hearsay testimony even when it does not conform to any other listed exception. These two residual clauses, Evidence Rules 803(23) and 804(b)(5), are founded on the recognition

> that there are certain exceptional circumstances where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently limited exceptions, and to have a high degree of probativeness and necessity could properly be admissible.

Commentary to Alaska Evidence Rule 803(23), first paragraph (quoting the report issued by the United States Senate Committee on the Judiciary concerning the corresponding provisions of the Federal Rules of Evidence). However, even though the Alaska Supreme Court included these residual clauses in Evidence Rules 803 and 804(b), the court has cautioned trial judges that the residual exceptions to the hearsay rule "are to

be used only on rare occasions". *A.S.W.,* 834 P.2d at 804. *Accord, Brandon v. State,* 778 P.2d 221, 227 (Alaska App.1989) ("From the commentary, it appears that it was anticipated that the residual exceptions were to be used rarely.")

 The residual hearsay exception at issue in this case, Evidence Rule 804(b)(5), reads (in pertinent part):

> (b) **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Under this rule, a court is authorized to admit hearsay evidence that is not specifically covered by any of the other exceptions listed in Rule 804(b) if the proponent of the evidence proves (1) that the person who made the out-of-court statement "is unavailable as a witness", (2) that the proposed evidence manifests "circumstantial guarantees of trustworthiness" equivalent to the guarantees of trustworthiness possessed by the hearsay covered in the other listed exceptions, (3) that the evidence is relevant to a "material" fact (an important disputed fact), (4) that the evidence "is more probative on [that] point ... than any other evidence which the proponent [could] procure through reasonable efforts", and (5) that "the general

---

1. To be precise, Alaska Evidence Rule 801(d) declares that various statements are not "hearsay" even though these statements clearly fall within the definition of hearsay contained in Rule 801(c). The drafters of the Federal Evidence Rules had certain philosophical reasons for removing the types of statements listed in Rule 801(d) from the definition of hearsay. The drafters of the Alaska Evidence Rules adopted

the same approach, partly from agreement with the federal drafters and partly to avoid a potentially confusing divergence from the numbering system used in the federal rules. *See* Commentary to Alaska Evidence Rule 801(d). However, for most purposes, the types of statements listed in Rule 801(d) can be thought of as being admissible despite their hearsay character—that is, as being exceptions to the hearsay rule.

purposes of [the evidence] rules and the interests of justice [would] best be served by admission of the [hearsay]".

■ Because the hearsay issue in this case arises in the context of a criminal prosecution, the hearsay must satisfy not only the requirements of Evidence Rule 804(b) but also the requirements of the Confrontation Clauses of the Federal and Alaska Constitutions (the Sixth Amendment to the United States Constitution and Article I, Section 11 of the Alaska Constitution). The residual hearsay exceptions in Evidence Rules 803(24) and 804(b)(5) are not "firmly rooted hearsay exceptions"; thus, any hearsay admitted under these residual clauses must demonstrate "particularized guarantees of trustworthiness" to satisfy the demands of the Confrontation Clause. *Idaho v. Wright*, 497 U.S. 805, 817–18, 110 S.Ct. 3139, 3147–48, 111 L.Ed.2d 638 (1990) (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). These "particularized guarantees of trustworthiness"

> must ... be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief.... [E]vidence admitted under [a residual hearsay exception] must ... be so trustworthy that adversarial testing would add little to its reliability.

*Idaho v. Wright*, 497 U.S. at 820–21, 110 S.Ct. at 3149.

■ In *Idaho v. Wright*, the United States Supreme Court held that, at least for Confrontation Clause purposes, a hearsay statement's "guarantees of trustworthiness" must be "inherent" in the statement. That is, the trustworthiness of the hearsay must be established solely from the circumstances of the statement and the mental state of the declarant. The required "guarantees of trustworthiness" may not be established by showing that the hearsay statement is corroborated by other evidence. *Idaho v. Wright*, 497 U.S. at 822–24, 110 S.Ct. at 3150–51.

#### The Challenged Evidence in this Case

On the afternoon of June 8, 1993, M.K. came to the office of the Nome police to report the theft of a four-wheel ATV (all-terrain vehicle). When M.K. stated that the four-wheeler had been stolen from a camp at Mile Four on the Nome–Council Highway, the police told M.K. that she had to make her report to the Alaska State Troopers because the Troopers had jurisdiction over the area where the theft occurred. Officer Kevin Michels was present at the police station when M.K. came to report the theft, and he overheard this conversation.

M.K. left the police station but she returned a little while later, this time accompanied by her boyfriend, Tim Powers. Again, M.K. tried to report the theft of the four-wheeler, and again the police directed her to the Troopers.

At approximately 4:20 p.m., M.K. and Tim Powers arrived at the State Troopers' office to report the theft of the four-wheeler. However, M.K. told the troopers that the vehicle had been stolen from a location in downtown Nome. When the troopers heard this, they told M.K. that the Nome police had jurisdiction over the theft.

In the meantime, while M.K. and Powers were at the State Troopers' office, the Nome police received a visit from Diana Freeman, an alcohol counselor. Ms. Freeman came to the police because one of her clients had told her that he was involved in, or had witnessed, a sexual assault earlier that morning. The Al–Anon client (appellant John Ryan) told Freeman that the assault had occurred at Mile Four on the Nome–Council Highway, and that, following the assault, he and a companion (appellant Jerome Trigg) had stolen the woman's four-wheeler. Ryan had given Freeman the key to the stolen four-wheeler, and Freeman turned this key over to the police.

Officer Michels heard Freeman's report, and he deduced that M.K. might have been the victim of the reported sexual assault. Officer Michels first went to interview Ryan. Ryan confirmed that he and Trigg had taken a woman to Trigg's camp at Mile Four of the Nome–Council Highway. Ryan told Michels that he had held the woman down while Trigg had forcible intercourse with her. Ryan said that he did not know the woman's

last name, but her first name was "M." According to Ryan, as the act of intercourse progressed, the woman stopped struggling and appeared to be enjoying it, so he went to an adjoining room. Ryan denied having sex with the woman himself.[2]

While Michels was speaking to Ryan, he received a call from his dispatcher; the dispatcher told Michels that M.K. had returned to the Nome police station. Michels went back to the station, where he conducted a tape-recorded interview with M.K..

When Officer Michels confronted M.K. with his suspicion that she had been raped, M.K. told him that this was true—that she had been raped by two men. M.K. told Michels that she did not know the names of the two men. However, she was able to identify photographs of John Ryan and Jerome Trigg, III, when she was shown a photo-lineup during the interview.

During this first interview with Michels, M.K. denied that she had been socializing with the two men prior to the assault. She told Michels that the two men stole the key to her four-wheeler from her pocket while she was in the Board of Trade Saloon in downtown Nome. The men then left the bar and drove away on her four-wheeler. M.K. told Michels that she enlisted the help of her uncle, who owned a white truck, and together she and her uncle followed the stolen four-wheeler to Mile Four of the Nome–Council Highway.

According to M.K.'s first interview, her uncle dropped her off at the cabin and left. M.K. entered the cabin, where she found the two men. Both men appeared to be drunk. They ordered M.K. to take off her clothes. M.K. said that she complied with their demand because she was scared. M.K. told Michels that both men sexually assaulted her, inserting both their penises and their hands inside her. M.K. told Michels that,

during the assault, one of the men pointed a rifle at her, and the men also hit her with a red-handled Phillips screwdriver.

After the assault, the men left on her four-wheeler, and M.K. began to walk back to town. She told Michels that she left a pair of blue socks at the cabin. When she got back to Nome, M.K. went to a friend's house and showered; then she contacted her boyfriend, Tim Powers, and started searching for the four-wheeler.

Michels asked M.K. for her uncle's name, but M.K. could not recall his name. When Officer Michels asked M.K. why she had not reported the sexual assault, M.K.'s first response was, "[Be]cause I was scared and Tim might—I'm scared". Then, when Michels asked M.K. to specify what she was scared of, M.K. asserted that the men had threatened to kill her if she ever told anyone about the assault. She repeated this assertion several times during the ensuing interview.

After sending M.K. to the hospital for a physical examination, Officer Michels obtained a search warrant for Trigg's cabin. In the cabin, Michels found M.K.'s socks, a red-handled Phillips screwdriver, and a plastic piece that had broken off the frame of M.K.'s eyeglasses.

The next day (June 9, 1993), Michels interviewed M.K. a second time. In this second statement, M.K. altered her previous account of how she arrived at the cabin. She also altered her account of how the rape occurred.

 In the second interview, M.K. admitted that she had been socializing with Trigg and Ryan at the Board of Trade. After the bar closed, she drove the two men out to Trigg's cabin on her four-wheeler. They took with them a large quantity of alcohol. M.K. told Michels that, at the cabin, the three of them continued to drink. At some point, M.K. asserted, things got out of hand and she was raped by both men.[3]

---

2. Ryan's initial statements to Freeman were less equivocal on the issue of whether M.K. was raped. Ryan told Freeman that he and Trigg "had been drinking at [Trigg's] camp and that they had a lady with them, and [Trigg] wanted to have sex with the lady and the lady did not[.]" Ryan also told Freeman that, afterward, he and Trigg took the woman's four-wheeler and drove back to town,

leaving the woman at the camp. Freeman asked Ryan if the woman "want[ed] this to happen", to which Ryan answered, "No, she fought." Freeman observed a bite mark on Ryan's hand; Ryan told Freeman that he had received this mark when the woman bit him as she struggled.

3. In its brief to this court, the State argues that M.K.'s later inconsistent statements (that is, her

During the second interview, Michels showed M.K. photographs of firearms in order to determine if she could identify the rifle that she said had been pointed at her during the assault. The group of photographs shown to M.K. included photos of guns that had been seized from the Trigg camp during the execution of the search warrant, as well as photos of weapons unrelated to the case. M.K. identified an unrelated rifle as being closest to the type of firearm that had been pointed at her.

M.K. was scheduled to testify before the Nome grand jury on June 11, 1993. However, she committed suicide early that morning by jumping into the ocean.

## The Superior Court's Ruling

In spite of M.K.'s death, the grand jury met on June 11 to consider indictments against Ryan and Trigg. The prosecuting attorney called Officer Michels to tell the grand jury about his two interviews with M.K.. This hearsay testimony was offered under two theories: that M.K.'s statements to Michels were "excited utterances" under Evidence Rule 803(2) and that M.K.'s statements to Michels constituted a "first complaint of rape" under the hearsay exception recognized in *Greenway v. State*, 626 P.2d 1060, 1060–61 (Alaska 1980). The grand jury indicted Ryan and Trigg for first-degree sexual assault.

Following their indictment, Ryan and Trigg challenged the admissibility of Michels's hearsay testimony. Judge Jeffery agreed with the defendants that neither of the prosecutor's theories of admissibility was valid.

█ The judge ruled that, under the circumstances of the case, M.K.'s statements were not excited utterances:

> Although the interview tape makes it clear that M.K. was still under a great amount of stress from the assault and the threats allegedly made by the assailants, her statements cannot be said to be spontaneous exclamations. She had twelve or more hours, including several hours in the company of her boyfriend, to think about the events that happened to her during the night.

Hearsay statements cannot be considered admissible "excited utterances" pursuant to Evidence Rule 803(2) unless it is shown that "the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation". *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir.1980), *quoted in Lipscomb v. State*, 700 P.2d 1298, 1307 (Alaska App.1985)[.] ... Even considering the stress apparently being felt by M.K. and the nature of the statements she made to the officer, the Court finds that the state

confession during the second interview that she had lied during the first interview) can not be used to determine the trustworthiness of the statements she made during the first interview. The State points out that the trustworthiness of a hearsay statement can not be established by proving that it is corroborated by other evidence. *See Idaho v. Wright*, 497 U.S. at 822–24, 110 S.Ct. at 3150–51; *Rychart v. State*, 778 P.2d 229, 232 (Alaska App.1989). The State asserts that, for similar reasons, the fact that the hearsay declarant has made inconsistent statements should not be used to evaluate the trustworthiness (or, more precisely, the *un*trustworthiness) of a hearsay statement.

The State's argument, while perhaps ingenious, is inconsistent with both the law and common sense. In judging the reliability of an absent person's assertion, reasonable people would want to know, and would take into account, the fact that the same person had made an inconsistent assertion on another occasion. The case

law recognizes and employs this rule of common sense. *See State v. Luzanilla*, 179 Ariz. 391, 880 P.2d 611, 616 (1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1406, 131 L.Ed.2d 293 (1995) (judging the trustworthiness of hearsay, in part, by asking whether the declarant has ever made inconsistent assertions); *United States v. Donlon*, 909 F.2d 650, 654 (1st Cir.1990) (judging the trustworthiness of hearsay by asking, among other things, whether the declarant has ever recanted the assertion); *Wilander v. McDermott Internat'l, Inc.*, 887 F.2d 88, 92 (5th Cir.1989) (same); *United States v. Doerr*, 886 F.2d 944, 956 (7th Cir. 1989) (citing *United States v. Snyder*, 872 F.2d 1351, 1355–56 (7th Cir.1989)) (same); *United States v. York*, 852 F.2d 221, 225–26 (7th Cir. 1988) (same). *See also United States v. Fernandez*, 892 F.2d 976, 983 (11th Cir.1989) (rejecting the admission of hearsay when the declarant had "an almost comically unreliable character" for truthfulness).

has failed to show that [her] statements were spontaneous, excited utterances.[4]

Judge Jeffery also rejected the prosecutor's theory that M.K.'s statements were admissible as a "first complaint" of rape. The judge correctly noted that evidence of the victim's first complaint is admitted to rebut the negative inference that might arise if the trier of fact heard no evidence to indicate that the victim had complained of the rape prior to trial. *Greenway,* 626 P.2d at 1060–61. Judge Jeffery ruled that, because the rationale of the "first complaint" exception is to corroborate the victim's testimony, the State can rely on this exception only when the victim testifies. Because M.K. had not testified at grand jury and could not testify at trial, her statements to Michels could not be admitted under the "first complaint" hearsay exception. *See Wigmore,* § 1136, Vol. 4, p. 310; *Baney v. People,* 130 Colo. 318, 275 P.2d 195, 198–99 (1954). The State does not challenge this ruling on appeal.

However, despite his rejection of the State's initial theories of admissibility, Judge Jeffery ruled that M.K.'s statements to Officer Michels were admissible under Evidence Rule 804(b)(5). He found that M.K. was not available as a witness, that M.K.'s statements dealt with facts material to the prosecution of Ryan and Trigg, and that M.K.'s statements were more probative than any other evidence available to the State.

As explained at the outset of this opinion, the remaining requirements for admissibility of hearsay under Evidence Rule 804(b)(5) center upon the trustworthiness of the hearsay. Judge Jeffery ruled that M.K.'s statements were trustworthy enough to be admitted under Rule 804(b)(5):

[M.K.] was afraid for her life if she told anyone about the sexual assault. She showed obvious stress and emotion when actually discussing the sexual assault.... Her statements were made in response to the most limited questioning by the officer, after she had voluntarily come to the police station. [Only] approximately twelve hours had passed since the assault; the incident was fresh in her mind.

....

The Court acknowledges the defendants' arguments about the unreliability of M.K.'s statement: she lied about ... the way she got out to the Trigg camp, [she lied when she asserted] that her ATV had been stolen at the bar in Nome, and [she lied when she asserted] that the two men dug in her pocket at the bar and took the key to the ATV. She admitted to the officer that these untruths were made because of her feelings about what her boyfriend would say about her use of the ATV to accompany the two men out to the Trigg camp. The defendants argue that these false statements in the initial interview show M.K.'s entire statement is suspect. They ... argue that she had a motive for inventing a sexual assault story, because she was ... worried about how her boyfriend would react to her having sex with other men[.]

[Nevertheless,] the Court finds that the factors supporting admissibility, including the Court's evaluation of [M.K.'s] demeanor while she was making the taped statement, outweigh the concerns presented by the defense. Her statements, including [her] identification [of Ryan and Trigg], have indicia of reliability roughly equiva-

4. On appeal, the State argues that Judge Jeffery was wrong to reject the "excited utterance" exception. The State points out that Judge Jeffery found that M.K. was under "a great amount of stress from the assault" when she gave her first statement to Officer Michels.

The fact that M.K. may have been under stress is not sufficient, by itself, to establish the admissibility of her hearsay statements under Evidence Rule 803(2). The question is whether M.K.'s out-of-court statements were the product of her conscious reflection about what she should say. "The theory of [Rule 803(2)] is ... that circumstances may produce a condition of excitement

which temporarily stills the [speaker's] capacity of reflection and produces utterances free of conscious fabrication." Commentary, Evidence Rule 803(1)–(2), third paragraph (emphasis added).

Judge Jeffery found that M.K. had had ample time to reflect on what she would say to the police. The record fully supports the judge's conclusion. M.K.'s statements to Officer Michels concededly contain several conscious fabrications. Judge Jeffery did not abuse his discretion when he ruled that these statements were not "excited utterances".

lent to the other exceptions to the hearsay rule stated in Evidence Rule 804(b).

**Our Analysis: Admissibility of the Hearsay Under Evidence Rule 804(b)(5)**

■ We employ an "abuse of discretion" standard to review the superior court's ruling on the admissibility of Officer Michels's hearsay testimony. *Matter of A.S.W.*, 834 P.2d at 803 n. 3. *Accord, United States v. Doerr*, 886 F.2d 944, 954 (7th Cir.1989); *United States v. Curro*, 847 F.2d 325, 327 (6th Cir.1988); *Page v. Barko Hydraulics*, 673 F.2d 134, 140 (5th Cir.1982). This standard of review bids us give considerable deference to the decision of the trial judge. Nevertheless, having reviewed the record, we conclude that the challenged hearsay testimony was not admissible.

■ As discussed above, the touchstone for determining the admissibility of hearsay under Evidence Rule 804(b)(5) is its trustworthiness. The hearsay must possess at least the same guarantees of trustworthiness that characterize the other types of admissible hearsay listed in Rules 804(b)(1)–(4).[5] To analyze the degree of trustworthiness possessed by a hearsay statement, courts have examined "the nature and character of the statement, the relationship of the [declarant to the other] parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made". *People v. Fuller*, 788 P.2d 741, 745 (Colo.1990) (citing Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence*, § 803(24)[01], Vol. 4, p. 803–376).

In judging M.K.'s statements to be trustworthy enough for admission under Rule 804(b)(5), Judge Jeffery relied in part on the circumstance that only twelve hours had elapsed since the events at the camp. From this, Judge Jeffery inferred that M.K.'s memory of these events was fresh and there-

fore her account was inherently more reliable. *Compare In re Drake*, 786 F.Supp. 229, 234–35 (E.D.N.Y.1992) (accuracy of the declarant's memory was inferred, in part, from the short time span between the events and the declarant's statement).

■ The shortness of the elapsed time between an occurrence and a witness's account of it may indicate that the witness has an accurate memory of the occurrence. However, the real question is not the accuracy of the witness's memory, but rather the accuracy of the witness's out-of-court statements. A witness who has a perfect memory of an occurrence may nevertheless misrepresent that occurrence when he or she speaks to others about it. Accurate memory will help ensure the trustworthiness of the witness's statements only if the witness is motivated to give an accurate account.

As Judge Jeffery himself noted, M.K. spent many hours "in the company of her boyfriend" before she gave her account of the sexual assault, and during this time M.K. had the opportunity "to think about the events that happened to her during the night". For these reasons, Judge Jeffery rejected the State's contention that M.K.'s statements to Officer Michels were "excited utterances". These factors also suggest a potential reason why M.K. might have been motivated to misrepresent the events that happened at the camp.

We note that M.K.'s first response, when asked why she had not reported the sexual assault earlier, was: "[Be]cause I was scared and Tim might—I'm scared". M.K. falsely told the Troopers and, later, Officer Michels that the four-wheeler had been stolen from a location in downtown Nome. Her apparent motivation was to avoid revealing to her boyfriend that she had gone drinking with two other men. The fact that M.K. may have

---

5. These other exceptions are: (1) testimony given at an earlier court hearing or deposition, if the party against whom this earlier testimony is being offered had the opportunity and motivation to examine the now-absent witness on the issues being litigated; (2) a statement made when the speaker believed that his or her death was imminent, if the statement concerned the cause or circumstances of the impending death; (3) a statement so against the speaker's monetary, pro-

prietary, or penal interest "that a reasonable person in the [speaker's] position would not have made the statement unless believing it to be true"; and (4) a statement concerning the speaker's own birth, adoption, ancestry, marriage, or other similar aspect of his or her personal or family history, as well as statements concerning similar aspects of a family member's or intimate friend's family history.

altered her account of the theft in anticipation of her boyfriend's likely reaction to the truth suggests that her account of the sexual encounter at the camp should be subjected to scrutiny.

 As one might infer from the preceding discussion, the primary factor used by courts in evaluating the trustworthiness of hearsay is the potential motivation of the absent speaker either to speak the truth or, conversely, to withhold or alter the truth. *See Rychart v. State,* 778 P.2d at 231 (Alaska App.1989) (citing *United States v. Marchini,* 797 F.2d 759, 763 (9th Cir.1986)). *See also Matanuska Electric Association, Inc. v. Weissler,* 723 P.2d 600, 611 n. 17 (Alaska 1986) (upholding the trial court's decision to admit the affidavit of an unavailable witness under Evidence Rule 804(b)(5); the trial judge found "a substantial guarantee of trustworthiness ... in the fact that the witness has no motive to testify favorably to [the] plaintiff, and in fact appears to dislike [the] plaintiff.")

A prime illustration of this principle is the decision in *Dallas County v. Commercial Union Assurance Co., Ltd.,* 286 F.2d 388 (5th Cir.1961), the case that convinced the Senate Committee on the Judiciary that the new Federal Rules of Evidence should include a residual hearsay exception. In *Dallas County,* the clock tower of a county courthouse had collapsed, damaging the courthouse. The collapse occurred a few days after the tower was struck by lightning. The main factual issue at trial was whether the collapse had been caused by the lightning strike (in which case the loss was covered by the insurance policy) or whether, instead, the collapse was due to pre-existing weakness and deterioration of the structure (in which case the loss was not covered). As stated in the Senate Committee's report,

> Investigation of the structure revealed the presence of charcoal and charred timbers. In order to show that lightning may not have been the cause of the charring, the insurer offered a copy of a local newspaper published over 50 years earlier containing an unsigned article describing a fire in the courthouse while it was under construction. The Court found that the newspaper [arti-

cle] did not fit within any ... recognized hearsay exception. The [c]ourt concluded, however, that the article was trustworthy because it was inconceivable that a newspaper reporter in a small town would report a fire in the courthouse if none had occurred.

(Quoted in Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, *Federal Rules of Evidence Manual* (6th ed. 1994), Vol. 3, pp. 1580–81.)

The rationale of the *Dallas County* decision, and indeed the underlying rationale of the residual hearsay exceptions, is that hearsay can be deemed trustworthy when all the circumstances suggest that the speaker had good reason to be truthful and no apparent reason to falsify or to withhold pertinent information. In such situations, courts have readily admitted hearsay statements.

For instance, in *State v. Echeverria,* 51 Or.App. 513, 626 P.2d 897 (1981), a burglary victim prepared a list of the items stolen from her house to aid the police in identifying and recovering the property. The victim died of natural causes before the defendant's trial; nevertheless, her list was admitted under Oregon's common-law equivalent to Rule 804(b)(5). The court concluded: "Mrs. McKean had no reason to falsify the list. On the contrary, she was motivated, except perhaps for the values she attached to the items, to give as accurate a list as possible to aid the police in locating her property." *Echeverria,* 626 P.2d at 900. Also see *In re Drake,* 786 F.Supp. at 234–35, where the court admitted a statement given by a woman to the FBI; the woman was trying to assist the FBI in locating her missing boyfriend, who had been abducted by mobsters but who she believed was still alive.

 In the present case, many circumstances suggest the truthfulness of M.K.'s report of sexual assault to Officer Michels. However, other circumstances suggest that M.K. may have had a motive to give an inaccurate account of what had happened to her. Her statements do not carry the same indicia of trustworthiness as the statements admitted in *Dallas County, Echeverria,* and *Drake.*

Courts have recognized that an alternative mark of trustworthiness is the speaker's awareness (or at least belief) that, by cooperating with the police, the speaker is jeopardizing his or her personal safety. For instance, in *United States v. Accetturo*, 966 F.2d 631, 635 (11th Cir.1992), *cert. denied, Basha v. United States,* —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993), the court allowed the government to introduce out-of-court statements of a deceased witness who had been in debt to loan sharks and who had already been threatened with physical harm when he decided to go to the police. The court concluded that the man (who was murdered following his police interview) "would have had no incentive to manufacture a statement that would cause an investigation and alert the defendants that he had gone to the police". *Accetturo,* 966 F.2d at 635 (footnote omitted). And in *United States v. Curro,* 847 F.2d 325, 327 (6th Cir.1988), the court upheld the admission of the testimony of a grand jury witness who committed suicide before trial. The court relied primarily on the fact that the witness had knowingly placed himself at considerable risk by testifying against organized crime figures.

In his decision in this case, Judge Jeffery relied heavily on *Accetturo.* The judge noted that M.K. had repeatedly told Michels that she had been threatened with death if she ever revealed the sexual assault. Judge Jeffery was also strongly influenced by the degree of emotional distress that M.K. exhibited on the tape recording of her first interview with Michels; the judge found that M.K.'s distress corroborated her assertions that she had been threatened. Based on this evidence, Judge Jeffery apparently concluded that M.K. had initially refrained from reporting the sexual assault because she feared future harm, but then she later found the strength to report the sexual assault despite her fear. Using *Accetturo* as a guide, Judge Jeffery concluded that M.K.'s statements about the sexual assault were trustworthy.

We, however, do not see such a clear analogy to *Accetturo.* The details of M.K.'s interview with Michels suggest an alternative view of M.K.'s state of mind at the time she asserted that she had been raped. When M.K. returned to the Nome police station after visiting the Troopers, she still intended simply to pursue the theft of the four-wheeler. It was Officer Michels who questioned M.K. as to whether she might have been sexually assaulted.

> M.K.: Somebody stole the Honda [ATV] and stole my carton of cigarettes and then beat me up and bit me right there, too. I don't know those two guys. They ...
>
> MICHELS: Okay.
>
> M.K.: ... broke my glasses, but I fixed it. I used Super Glue; I bought some.
>
> MICHELS: I just talked to one of them, [and he] said [that] the other guy sexually assaulted you. Is that true?
>
> M.K.: Yeah.
>
> MICHELS: Okay. Do you know either one of [their] names?
>
> M.K.: I don't even know their names. They—they raped me, too.
>
> MICHELS: Both of them?
>
> M.K.: Yeah, both of them.
>
> MICHELS: How come you didn't report this right away when you first came ...
>
> M.K.: Because ...
>
> MICHELS: ... into the office?
>
> M.K.: Because they took it while I was at the BOT [Board of Trade]—they took it, they took the Honda.
>
> MICHELS: Okay, but I ...
>
> M.K.: They ...
>
> MICHELS: ... but I mean the sexual assault and that stuff.
>
> M.K.: 'Cause I was scared, and Tim might—I'm scared.
>
> MICHELS: Scared of?
>
> M.K.: Those two people.
>
> MICHELS: Those ...
>
> M.K.: Because they—they said that they were going to kill me if I tell somebody some—if I tell[.]

Judge Jeffery concluded, after listening to the interview, that M.K. had been afraid for her life, that she then overcame her fear and revealed the sexual assault to Michels, and that therefore her later statements possessed

a substantial guarantee of trustworthiness. This conclusion, while perhaps reasonable, is not the only plausible explanation for M.K.'s statements; many of the facts argue against this conclusion.

Even though M.K. ostensibly feared for her life if she revealed the sexual assault, M.K. unhesitatingly replied "Yes" the first time Michels asked her if she had been assaulted. A moment later, apparently to make sure that Michels had understood her answer, M.K. volunteered, "They raped me, too."

Further, even after M.K. agreed that she had been sexually assaulted, she continued to mislead Michels about the theft of the ATV and how she came to be at the remote camp in the company of Ryan and Trigg. M.K.'s continuing, conscious attempt to mislead Officer Michels about major details of the occurrence is at least arguably inconsistent with the superior court's view of M.K. as a crime victim who, suddenly freed from a stifling fear, could finally reveal the truth.

We also note that there is a certain circularity in the superior court's reason for crediting M.K.'s statements. Judge Jeffery found that M.K. was under emotional stress when she spoke to Officer Michels. He further found that M.K.'s emotional stress stemmed from death threats made to her by Ryan and Trigg. However, in reaching this conclusion, Judge Jeffery seems to have assumed the trustworthiness of M.K.'s statements concerning the death threats, then used this assumption as the foundation for his conclusion that M.K.'s emotional distress stemmed from these threats—a conclusion that allowed him to draw the analogy to *Accetturo* and deem M.K.'s statements trustworthy.

The source of M.K.'s emotional distress is not self-evident. As the above-quoted excerpt of the interview shows, when M.K. initially explained why she had failed to report the sexual assault, she referred to her boyfriend, Tim Powers. M.K.'s answer to Officer Michels's question was: " 'Cause I was scared, and Tim might—I'm scared". M.K.'s answer is undoubtedly ambiguous. The fright she mentions may indeed have arisen from the threats of death she later

described. However, one can not ignore the possibility that M.K. had other motives for failing to report a sexual assault.

Moreover, even assuming that M.K. was afraid of harm when she spoke to Officer Michels, this does not necessarily make her case analogous to *Accetturo* and *Curro*. A speaker's fear does not, by itself, guarantee the truthfulness of his or her statements. Indeed, fear often leads people to falsify or to hold back the truth.

The crucial aspect of *Accetturo* and *Curro* is that, under the circumstances of those cases, the out-of-court speakers had little to gain and much to lose by providing information against mobsters who could retaliate against them (either personally or through a web of associates). By providing incriminating information to the police, the speakers placed themselves at risk and obtained no apparent benefit for themselves. They therefore might be compared to people who make statements against their own pecuniary or penal interest; see Evidence Rule 804(b)(3), which creates a hearsay exception for statements "so far contrary to the declarant's ... interest ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true".

M.K.'s situation presents a different sort of case. Although her reluctance to make a report of sexual assault may have stemmed from her fear of Ryan and Trigg, the circumstances also suggest other possible reasons why she might have misrepresented her encounter with the two men.

We are not suggesting that we think M.K. was lying when she told Officer Michels that she had been sexually assaulted. Our task is not to determine whether M.K. was telling the truth. Instead, our duty is to determine whether M.K.'s statements to Officer Michels are so inherently trustworthy, so free from possible doubt, that cross-examination of M.K. concerning those statements would yield negligible benefit to Ryan and Trigg as they stood trial for sexual assault. Viewing all the circumstances of this case, we can not say that Ryan and Trigg would have derived no substantive benefit from cross-examining

M.K. about her statements to Officer Michels.

When the record is examined as a whole, it is clear that M.K.'s statements to the police did not have "circumstantial guarantees of trustworthiness" equivalent to the guarantees of trustworthiness possessed by the hearsay covered in the other exceptions listed in Evidence Rule 804(b)(1)–(4). We therefore conclude that Officer Michels's testimony about M.K.'s statements to him was not admissible under Evidence Rule 804(b)(5).

For similar reasons, we also hold that admission of M.K.'s statements against Trigg at his criminal trial violated the Confrontation Clauses of the United States and the Alaska Constitutions. M.K.'s statements are not so obviously trustworthy that little would be gained by subjecting them to inquiry through cross-examination. *Idaho v. Wright,* 497 U.S. at 821, 110 S.Ct. at 3149.

Conclusion

Ryan and Trigg stand in different procedural postures on appeal. Because of this, we reach different resolutions of their two appeals.

In the superior court, Trigg attacked his grand jury indictment, asserting that Officer Michels's hearsay testimony was inadmissible. When this attack failed, Trigg went to trial. During the trial, Trigg again unsuccessfully objected to the admission of this hearsay. Thus, Trigg preserved the hearsay issue both for purposes of attacking his indictment and attacking his conviction.

Ryan also attacked his grand jury indictment. However, when this attack failed, Ryan chose not to go to trial; instead, he entered a *Cooksey* plea. This plea was premised on the assumption (indeed, the State's stipulation) that the admissibility of M.K.'s statements was a dispositive issue— that the State would have no case against Ryan if M.K.'s out-of-court statements were ruled inadmissible. ⸲

■ An evidentiary issue is dispositive for *Cooksey* purposes only if, following a ruling in favor of the defendant, the government's remaining evidence would be insuffi-

cient to withstand a defense motion for judgement of acquittal. *Miles v. State,* 825 P.2d 904, 906 (Alaska App.1992). This does not appear to be the case here.

Ryan confessed that he had helped Trigg commit a sexual assault upon a woman whose first name was "M.". Ryan also confessed that he and Trigg had stolen the woman's ATV the next morning. He possessed and later relinquished the key to the stolen ATV. M.K. exhibited physical injuries consistent with having been assaulted. Moreover, when the police searched Trigg's camp at Mile Four of the Nome–Council Highway, they found evidence that corroborated Ryan's confession.

■ This evidence, when viewed in the light most favorable to the State, appears sufficient to corroborate Ryan's confession for purposes of the corpus delicti rule. *See Castillo v. State,* 614 P.2d 756, 758 (Alaska 1980); *Armstrong v. State,* 502 P.2d 440, 447 (Alaska 1972). Because this evidence, even without the support of M.K.'s statements, could apparently withstand a motion for judgement of acquittal, the admissibility of M.K.'s statements to Officer Michels is not dispositive under *Miles.*

■ For similar reasons, Ryan's grand jury challenge is also not dispositive for *Cooksey* purposes. As just noted, the State has sufficient evidence (even without M.K.'s statements) to make a case against Ryan. Thus, even if we were to overturn Ryan's indictment because of Officer Michels's hearsay testimony, the State could still reindict Ryan. *Compare Shetters v. State,* 751 P.2d 31, 36 (Alaska App.1988); *Wilson v. State,* 711 P.2d 547, 550 n. 2 (Alaska App.1985) (A defendant who claims to have received ineffective assistance of counsel because the defense attorney failed to attack the grand jury indictment must show not only that the attack would have succeeded but that the State thereafter could not have obtained another indictment.). Thus, Ryan's grand jury issue is not dispositive of the charge against him, and it can not be litigated by way of a *Cooksey* plea.

Because the hearsay issue Ryan raises on appeal is not dispositive of the charge against

him, Ryan's *Cooksey* plea is invalid. We therefore dismiss his appeal. *Heuga v. State*, 609 P.2d 547, 548 (Alaska 1980); *Miles*, 825 P.2d at 907. Because Ryan has not received the expected benefit of his plea bargain (the right to litigate the hearsay issue on appeal), Ryan must be given the opportunity to withdraw his no contest plea.

▉▉▉▉ We now turn to resolution of Trigg's appeal. Because Trigg went to trial and because the State used M.K.'s out-of-court statements to secure Trigg's conviction, we reverse Trigg's conviction. (The State does not argue that the erroneous admission of M.K.'s statements could be considered harmless error.)[6]

We must next address Trigg's claim that his indictment should be set aside because the grand jury heard the inadmissible hearsay testimony concerning M.K.'s statements. The test governing this claim was explained in *Stern v. State*, 827 P.2d 442 (Alaska App. 1992):

> [W]hen a defendant proves that the grand jury heard improper evidence, the superior court must engage in a two-part analysis. The superior court first subtracts the improper evidence from the total case heard by the grand jury and determines whether the remaining evidence would be legally sufficient to support the indictment. If the remaining evidence is legally sufficient, the court then assesses the degree to which the improper evidence might have unfairly prejudiced the grand jury's consideration of the case. The question the court must ask itself is whether, even though the remaining admissible evidence is legally sufficient to support an indictment, the probative force of that admissible evidence was so weak and the unfair prejudice engendered by the improper evidence was so strong that it appears likely that the improper evidence was the decisive factor in the grand jury's decision to indict.

*Stern*, 827 P.2d at 445–46.

On appeal, Trigg relies primarily on the fact that, in the superior court, "the State repeatedly acknowledged ... that, without M.K.'s statements, the State had no case". As we have just pointed out, the State was wrong, at least for *Cooksey* purposes. The grand jury evidence included Ryan's confession as well as evidence developed during the medical examination of M.K. and evidence found during the search of Trigg's camp. This evidence was sufficient to support the grand jury's decision to indict Trigg.[7]

However, despite the fact that the State's remaining evidence, if unexplained and uncontradicted, was sufficient to obtain an indictment, our review of the grand jury record convinces us that the grand jury's decision to indict Trigg must have been heavily influenced by the evidence of M.K.'s statements to Officer Michels. We therefore set aside Trigg's indictment. *Stern*, 827 P.2d at 446.

To summarize:

Jeffery should have dismissed the prosecution against him with prejudice.

We, however, conclude that Judge Jeffery did not abuse his discretion when he selected this remedy for the State's negligent loss of evidence. *Putnam v. State*, 629 P.2d 35, 43–44 (Alaska 1980) (selection of an appropriate sanction when the government has lost evidence relevant to a criminal trial "is best left to the sound discretion of the trial judge"). Trigg's defense at trial was that he had engaged in consensual sexual intercourse with M.K.. Given this defense, Trigg suffered no prejudice from the loss of the rape protocol kit.

---

**6.** Trigg raises two other arguments on appeal, both concerning the State's loss of evidence before trial. The tape recording of M.K.'s second interview with Officer Michels and the "rape protocol kit" (the set of physical samples collected from M.K. during a physical examination) were both lost before trial. Judge Jeffery found that the loss was caused by police carelessness, not bad faith.

With regard to the loss of the tape recording of M.K.'s second police interview, Judge Jeffery ruled that Trigg had not been prejudiced. That ruling is now moot.

With regard to the loss of the rape protocol kit, Judge Jeffery found that Trigg had been prejudiced. As a remedy, the judge instructed Trigg's jury that the physical examination performed on M.K. "showed no evidence linking Jerome Trigg ... with any sexual penetration or sexual contact [with] M.K.". Trigg argues that this instruction was not an adequate remedy and that Judge

**7.** Alaska Statute 12.45.020, which requires corroboration of an accomplice's testimony to sustain a criminal conviction, does not apply to grand jury proceedings. *Merrill v. State*, 423 P.2d 686, 695 (Alaska 1967).

(1) Ryan's *Cooksey* plea is invalid because the issues he preserved for appeal are not dispositive. Ryan's appeal is DISMISSED and his case is REMANDED to the superior court; Ryan shall be allowed to withdraw his plea of no contest.

(2) In Trigg's appeal, we hold that M.K.'s statements to Officer Michels were not admissible under Evidence Rule 804(b)(5). Trigg's conviction for second-degree sexual assault is REVERSED and his indictment is set aside. If the State reindicts Trigg, he is entitled to a new trial.