Steven CLEVELAND, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8223.

Court of Appeals of Alaska.

May 28, 2004.

Robert D. Lewis, Nome, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Steven Cleveland was convicted of second-degree sexual assault and second-degree assault for sexually penetrating a woman with a wide-diameter object, inflicting serious and lasting internal injuries.[1]  In this appeal, Cleveland asserts that the trial judge improperly prevented him from presenting evidence suggesting that these crimes were committed by someone else.  In particular, Cleveland argues that the trial judge should have allowed him to present evidence that another man, Harry Morena, beat the same woman on the head with a wooden chair leg about five months after the sexual assault that Cleveland was charged with.

Cleveland accuses the trial judge of having violated the *Smithart–Marrone* rule—a rule that governs a criminal defendant's ability to introduce evidence tending to show that the crime was committed by someone else.[2]  But the trial judge never invoked the *Smithart–Marrone* rule to restrict Cleveland's introduction of otherwise admissible evidence.

That is, the trial judge did not exclude Cleveland's offered evidence on the basis that it was offered for an improper purpose (*i.e.,* offered to prove that someone else committed the crime, before Cleveland had established the requisite foundation for this proof under *Smithart* and *Marrone* ).  Rather, the trial judge excluded Cleveland's offered evidence because it was not admissible under the rules of evidence.

We conclude that the trial judge's evidentiary rulings were not an abuse of discretion.  We therefore uphold those evidentiary rulings, and accordingly we affirm Cleveland's convictions.

Cleveland also argues that his composite sentence—19 years to serve—is excessive.  For the reasons explained in this opinion, we conclude that this sentence is not clearly mistaken, and we therefore affirm it.

*Background facts*

Steven Cleveland was convicted of second-degree sexual assault and second-degree assault for sexually penetrating a woman, H.C., during a weekend drinking binge at Cleveland's house in the village of Ambler on November 17–19, 2000.  Sometime between Friday night, November 17th, and Saturday evening, November 18th, H.C. was forcibly penetrated anally with an object that was somewhere between four and six inches in diameter.  This sexual penetration tore H.C.'s body to a depth of four to six inches, inflicting serious and lasting internal injuries on H.C.

The episode started on Friday evening, November 17th, when Cleveland invited H.C. over to his house to enjoy a batch of home brew that he had prepared.  During the course of the evening, H.C. consumed so much home brew that she passed out, and she never went home that night.  The next day (Saturday, November 18th), three other Ambler residents—all of them H.C.'s relatives—came to Cleveland's house and drank

1.  AS 11.41.420(a) and AS 11.41.210(a), respectively.

2.  *Smithart v. State,* 988 P.2d 583, 586–592 (Alaska 1999), interpreting *Marrone v. State,* 359 P.2d 969, 984–85 n. 19 (Alaska 1961).

home brew with Cleveland and H.C. These three were: H.C.'s brother, Harry Morena; her half-sister, Mary Williams; and her niece, Mary's 19 year old daughter, Dora.

Dora Williams, Mary Williams, and H.C. all testified at Cleveland's trial, and they each offered slightly different versions of what happened on that Saturday.[3]

Dora Williams testified that she and her mother and Harry Morena arrived at Cleveland's house around 10:00 in the morning; Cleveland and H.C. were already there. According to Dora, H.C. was sitting on a couch when they arrived, but H.C. was pretty drunk and she soon got down on the floor. Mary Williams and Harry Morena tried to get H.C. back up on the couch again, but they discovered that she had passed out, so they left her on the floor. Dora testified that H.C. had no apparent injuries at that time, nor did Dora see any blood on H.C.'s clothing or on the floor.

Dora testified that she and her mother and Morena stayed at Cleveland's house for about half an hour, and then they departed as a group—leaving Cleveland and H.C. alone in the house. As they were leaving, Dora heard her mother Mary tell Harry Morena to keep checking on H.C. According to Dora, that was the only time that she visited Cleveland's house that day.

Mary Williams testified that she and Dora and Harry Morena all arrived at Cleveland's house at about 9:00 or 9:30 on Saturday morning. Cleveland and H.C. were already there. Mary testified that H.C. was sitting on the couch while they were there. H.C. was "in the early stage of drinking" when they arrived, and she was "getting buzzed" by the time they left Cleveland's house less than an hour later. Like Dora, Mary Williams testified that H.C. had no apparent injuries and that there was no blood in sight at that time.

Mary testified that she returned twice that day to Cleveland's house because she was worried about H.C. Here, Mary's testimony diverged somewhat from Dora's: Mary testi-

fied that Dora accompanied her on these return trips.

According to Mary, she and Dora first returned to Cleveland's house before 11:00 in the morning. They tried to get into the house; when they found the door locked, they pounded on the door for about fifteen minutes. Finally, Cleveland came to the door and let them in.

Mary went inside and found H.C. lying on the floor, "totally ... passed out", with her pants down below her waist. Finding H.C. in this condition, Mary started yelling at Cleveland, demanding to know if he had "bothered" H.C. Cleveland denied doing anything.

Mary tried to wake up H.C., but she was unresponsive. Mary then decided to summon help. Mary testified that she returned to Cleveland's house with Dora and Harry Morena. She said that she did not have a clear memory of that third visit because she was "partially blacked out" from drinking.

On cross-examination, Mary admitted that she and H.C. had once had a major conflict: three years before (*i.e.*, in late 1997 or early 1998), Mary found out that H.C. had been sleeping with Mary's husband. Mary stood outside H.C.'s house, screamed at her, and threw rocks or large pieces of firewood through H.C.'s windows.

However, according to Mary, she and H.C. reconciled two months later-and Mary got rid of her philandering husband. Mary explained the reconciliation by noting that she and H.C. are half-sisters who have known each other all of their lives. (This window-breaking incident, and the subsequent reconciliation, were both confirmed by H.C. when she testified.)

The third witness to testify about the events of Saturday, November 18th, was the victim, H.C. She testified that she asked her brother, Harry Morena, to take her to Cleveland's house on Friday evening, November 17th, and to come back for her later. H.C. testified that she had five or six glasses of

---

**3.** We are speaking here of the testimony given by these witnesses at Cleveland's second trial. Cleveland was tried twice; his first trial ended in a mistrial. We do not have a transcript of the testimony at that first trial.

home brew that night, and then she passed out.

When H.C. regained consciousness, she was lying on the floor of Cleveland's house, and she was in a lot of pain. At first, she thought that she was simply hung over, but then she noticed that there was blood on her pants and that the pain was severe in her rectum. She tried to get up, but she was too weak. She then crawled over to the couch, pulled herself up, and lay there.

Cleveland brought water to H.C., but as soon as she drank it, she began to vomit. H.C. lay on the couch and apparently passed out again. She awoke to find Cleveland cleaning her blood from the floor.

At this point, Cleveland asked H.C. if she wanted to go to bed with him. H.C. answered that she was too sick and in too much pain for that. Cleveland then asked H.C. if she wanted to touch his penis, but H.C. again declined.

H.C. testified that, during the morning, Harry Morena came to Cleveland's house to check on her. Morena came inside the house and spoke to H.C. where she lay on the couch, but H.C. told Morena that she was too sick to get up. H.C. told Morena to come back later, when she was feeling better, and Morena said that he would do so.

Morena returned to Cleveland's house about three or four hours later. This time, however, Cleveland did not let Morena come in; instead, Cleveland went outside to speak to Morena. (Cleveland's house has a "kanachuk"—*i.e.*, an arctic entry vestibule, so that one must pass through two doors to get inside the house.) H.C. heard Cleveland tell Morena that she was still sick, and then Morena left.

H.C. testified that Morena came back a third time, about three or four hours after that. This time, however, Cleveland did not respond to Morena's knocking.

H.C. said that she had no recollection of either Dora or Mary Williams coming to Cleveland's house. She did, however, recall hearing the voice of Ronald Cleveland outside the door, one time, with Harry Morena.

Ronald Cleveland (a second cousin to both H.C. and Steven Cleveland) also testified at Cleveland's trial, and he partially corroborated H.C.'s testimony on this point. Ronald stated that he and Harry Morena went to Cleveland's house toward the end of the day on Saturday, November 18th, so that Harry Morena could check on H.C. However, Ronald's testimony differed from H.C.'s in that he stated that Cleveland did respond to their knocking. Ronald said that when he and Morena knocked on Cleveland's outer door, Cleveland came to the door and stepped outside to talk to the two men. This was unusual, Ronald declared, because Cleveland normally would answer a knock on his door by simply telling visitors to "come on in".

According to Ronald, Morena told Cleveland that he wanted to check on his sister. But when Cleveland replied that H.C. was sleeping, Morena and Ronald left without going inside.

H.C. remained at Cleveland's house until mid-morning the next day (Sunday, November 19th), when she used Cleveland's telephone to call her stepfather, Merrill Morena, and asked him to come take her home.

Although H.C. was still in extreme discomfort, she apparently did not realize the extent of her internal injuries. But by Tuesday morning (November 21st), H.C. was too weak to get up. She then sought medical attention by telephoning the community health clinic. The health aide came to H.C.'s house, examined her, and arranged to have her medevacked to Anchorage, where H.C. underwent surgery.

Cleveland was subsequently indicted for both first-degree sexual assault and first-degree assault (for causing the serious physical injury). He was tried twice: the first trial ended in a mistrial; the second trial ended with guilty verdicts on the lesser offenses of second-degree sexual assault and second-degree assault.

Cleveland's defense was that there was a substantial possibility that someone else had committed these crimes. Cleveland's attorney acknowledged that only a small group of people had the opportunity to sexually assault H.C., but he argued that Dora Williams,

Mary Williams, and Harry Morena were all likely suspects.

In particular, the defense attorney asserted that Dora Williams was lying when she testified that she had visited Cleveland's house only once on Saturday, November 18th. (As explained above, Dora's mother, Mary, testified that Dora had accompanied her when she twice returned to Cleveland's house later that day to check on H.C.) The defense attorney suggested that Dora was trying to hide something.

In addition, the defense attorney reminded the jurors of the incident in which Mary Williams screamed at H.C. and broke her windows because H.C. had engaged in adultery with Mary's husband. The defense attorney asserted that this incident showed that Mary was capable of erratic and violent behavior when she was drunk. And the defense attorney asked the jury to consider why Mary was so intent on returning to Cleveland's house to "check on" H.C. He insinuated that Mary might have been trying to settle an old score.

And the defense attorney also accused Harry Morena. He noted that blood had been found on a sweatshirt in Cleveland's house, and he noted that the State had failed to present any evidence as to whom that sweatshirt belonged to. The defense attorney asserted that the sweatshirt belonged to Morena: that Morena had gotten blood on the sweatshirt while he was sexually assaulting his sister, that he had removed the sweatshirt when he cleaned himself after the attack, and that he had then forgotten about the sweatshirt when he left Cleveland's house and locked the door behind him—so that the sweatshirt was still hanging there when the police searched the house.

In sum, the defense attorney told the jury, Cleveland may have been "the most likely candidate" (*i.e.*, the most likely perpetrator of the sexual assault), "but just [naming the] likely candidate doesn't get the [government's] job done." The defense attorney argued that, because the perpetrator could have been Mary Williams, or Dora Williams, or Harry Morena, the government had failed to prove Cleveland's guilt beyond a reasonable doubt.

Despite these arguments, the jury convicted Cleveland of the sexual assault and the physical assault. On appeal, Cleveland argues that the trial judge committed error in three different evidentiary rulings. Each of these rulings dealt with evidence that Cleveland asserted would tend to exculpate him by suggesting that Harry Morena was the true culprit.

*The trial judge's hearsay ruling: Morena's invocation of his privilege against self-incrimination, and Cleveland's ensuing attempt to introduce some of Morena's out-of-court statements through the hearsay testimony of a state trooper*

This issue first arose in an evidentiary hearing that was held during Cleveland's first trial in mid-June 2001. The defense attorney wanted to call Harry Morena to the stand and have him testify about his several visits to Cleveland's house on the weekend of the sexual assault (November 18–19, 2000). However, the defense attorney informed the trial judge—Superior Court Judge Richard H. Erlich—that it appeared likely that Morena was going to invoke the Fifth Amendment if he was called as a witness at Cleveland's trial.

At the time of Cleveland's first trial, Morena was in jail: he had been arrested two weeks before (on June 1, 2001) on charges that he assaulted his sister, H.C., by beating her on the head with a chair leg during an argument. When Morena was brought to court for the evidentiary hearing, he was accompanied by the assistant public defender who was representing him in the assault case.

Cleveland's attorney told Judge Erlich that he wanted to ask Morena questions about what Morena saw and did while he was at the Cleveland house on the weekend of November 18th–19th, because, "in the end, I want to assert that Harry Morena sexually assaulted and physically assaulted his sister, H.C., [that he] perpetrated the crime that Steven Cleveland is currently charged with."

The defense attorney also wanted to question Morena about his alleged recent assault on his sister—an assault that had allegedly occurred on May 27th (two and a half weeks

before this evidentiary hearing). The defense attorney told Judge Erlich that he was going to assert that the "table leg" [*sic:* it was a chair leg] that Morena allegedly used against H.C. on May 27th was, in fact, the very same instrument that Morena had used to sexually penetrate H.C. six months before (*i.e.,* the previous November).

The defense attorney made two arguments as to why this evidence would be admissible. First, he declared that the supreme court's decision in *Smithart* guaranteed him the right to introduce "any evidence which would tend to establish a reasonable doubt of the defendant's guilt". Second, he declared that evidence of Morena's assault on H.C. was admissible by analogy to Evidence Rule 404(b)(4)—the rule which states that, in trials for acts of domestic violence, the State may introduce evidence of the defendant's other acts of domestic violence.

Morena was then put on the stand for voir dire examination. Even though Morena showed no hesitancy in answering several questions about visiting Cleveland's house during the weekend in November 2000 when H.C. was sexually assaulted, Morena's attorney eventually objected to Cleveland's attorney's questions, and Judge Erlich ultimately ruled that Morena had a Fifth Amendment right not to answer questions about his activities at Cleveland's house that weekend.

Following this ruling, there is a 50 minute break in the transcript. The transcript picks up again in the middle of the trial proceedings, just as a bench conference was beginning. From the discussion that took place at the bench conference, it appears that the bench conference was called while Trooper Todd Summey was on the stand, being cross-examined by the defense attorney. Trooper Summey was the trooper who investigated Morena's assault on H.C. at the end of May 2001, and he was also part of the team that had investigated the sexual assault on H.C. the previous November.

The defense attorney had apparently asked Trooper Summey to tell the jury what Morena had said to the troopers about his visits to Cleveland's house on the weekend of the November sexual assault, and the defense attorney's question had drawn a hearsay objection from the prosecutor.

At the bench conference, the defense attorney responded to the hearsay objection by declaring:

> *Defense Attorney:* I'm going to assert that [Morena] is unavailable [because of his invocation of the privilege against self-incrimination], and therefore any statements that he ... made to the trooper—which, you know, I think have nothing to do with, sort of credibility issues or anything—are things that [the defense] should at least be allowed to begin to explore. I think that there are some questions about whether or not [Morena] may be, you know, available for cross-examination purposes and that kind of stuff. But I think [that] the witness has voluntarily absented himself, and I think [that] we're at least entitled to inquire about some of the foundational stuff—which has, interestingly enough, nothing to do with him as a witness or a ... [At this point, Judge Erlich makes an indiscernible comment, and the defense attorney stops speaking.]

A few minutes later (following a short recess), the defense attorney made an offer of proof concerning the statements that he was trying to elicit:

> *Defense Attorney:* We're asking the Court to allow us to ask the trooper about ... Mr. Morena's recitation of events to the trooper. And, as [an offer of proof], [the trooper] would say [that Morena said] words to the effect that he had been to the [Cleveland] house on November 18th at or about 9:00 or 10:00 ... in the morning. He could not be sure of the exact times. [H.C.] had awakened him to let him know she would be at Steven Cleveland's house. Later, when [Morena] woke up, he went to Steven Cleveland's residence to check on [H.C.] because he knew [that] she was probably drinking alcohol. At about 4:00 or 5:00 ... in the afternoon, he went to Steven Cleveland's residence with Dora Williams, and [he] saw [H.C.] passed out on the couch. [He] tried to pick her up and take her home, [but] she was too heavy. He ... only moved her off the couch to the floor, [and then] he left her

there to sleep it off. . . . Between 7:00 and 8:00, he went back to Steven Cleveland's residence with Ron Cleveland. That's the expected testimony from the trooper.

In fact, the testimony that the defense attorney was trying to elicit was double hearsay. Not only were Morena's statements made outside of court, but those statements were made to a different trooper. Trooper Summey (the person who was currently on the witness stand) had personally interviewed Morena about the recent May 27th assault on H.C., but another trooper—Trooper Richard Terry—was the one who had interviewed Morena on November 27, 2000, about Morena's activities and visits to Cleveland's house during the weekend of the sexual assault on H.C.

When Judge Erlich asked Cleveland's attorney how this proposed testimony fell within any exception to the hearsay rule, the defense attorney answered that it fell within the "catch-all" provision of Evidence Rule 804—that is, Evidence Rule 804(b)(5), which is generally referred to as the "residual" hearsay exception. *See Ryan v. State*, 899 P.2d 1371, 1374 (Alaska App.1995).

The defense attorney noted that Morena was "clearly unavailable". He then asserted that Morena's out-of-court statements satisfied the requirements of Evidence Rule 804(b)(5) because these statements were being offered to prove material facts, they were more probative on these matters than any other evidence available to the defense, and the general purposes of the hearsay rules would be served by the admission of these statements.

We do not have a transcript of the testimony presented at Cleveland's first trial. But we do have the testimony presented at Cleveland's second trial—and, based on that testimony, it is clear that the defense attorney was wrong when he asserted that there was no other evidence available to prove Morena's whereabouts and activities on the November weekend in question. H.C. testified that she remembered Morena coming to Cleveland's house three times on Saturday, November 18th. And Mary Williams testified that Morena was with her at Cleveland's house at least twice on that Saturday.

Moreover, as Judge Erlich noted, *Ryan* holds that before hearsay statements can be introduced under the residual exception, the circumstances surrounding those statements must carry guarantees of trustworthiness "equivalent to or exceeding" the guarantees of trustworthiness that characterize the recognized exceptions to the hearsay rule. *See Ryan*, 899 P.2d at 1374 (quoting the first paragraph of the commentary to Alaska Evidence Rule 803(23)) and at 1379.

■ After Judge Erlich declared that he did not see how Morena's statements to the troopers carried special guarantees of trustworthiness, the defense attorney responded that much of what Morena said to the troopers was corroborated by the testimony of other witnesses. But we explicitly held in *Ryan* that the guarantees of trustworthiness required by the residual hearsay exception can not be proved by showing that an out-of-court statement is corroborated by other evidence. Rather, the required guarantees of trustworthiness "must be established solely from the circumstances of the statement and the mental state of the declarant".[4]

■ We conclude that Judge Erlich did not abuse his discretion when he ruled that Morena's statements to Trooper Terry concerning his visits to Cleveland's house on the weekend of November 18–19, 2000 did not carry the circumstantial guarantees of trustworthiness required by Evidence Rule 804(b)(5). For this reason, and for the further reason that much of the same information concerning Morena's visits to the house was available through the testimony of other witnesses, Judge Erlich did not abuse his discretion when he ruled that Cleveland's proposed hearsay testimony was not admissible under the residual hearsay exception.

*Cleveland's challenge to this hearsay ruling: his assertion that the Alaska Supreme Court's decision in Smithart v.*

---

4. *Id.*, 899 P.2d at 1375, citing *Idaho v. Wright*, 497 U.S. 805, 822–24, 110 S.Ct. 3139, 3150–51, 111 L.Ed.2d 638 (1990).

*State exempts criminal defendants from the hearsay rules when defendants are attempting to show that someone else might have committed the crime*

On appeal, Cleveland contends that Judge Erlich's hearsay ruling is at odds with the Alaska Supreme Court's decision in *Smithart v. State*, 988 P.2d 583 (Alaska 1999). Cleveland argues that *Smithart* guarantees him the right to introduce any evidence that might tend to raise a reasonable doubt concerning his guilt, even though this evidence might otherwise be inadmissible under the normal rules of evidence. Cleveland has misinterpreted *Smithart*.

### (a) The supreme court's decision in Smithart v. State

In *Smithart*, the supreme court was called upon to interpret and clarify its earlier decision in *Marrone v. State*, 359 P.2d 969, 984–85 n. 19 (Alaska 1961), in which the court adopted a common-law rule that limits a criminal defendant's ability to introduce evidence tending to show that another person committed the crime for which the defendant is on trial.

In *Marrone*, the supreme court held that a defendant seeking to prove that someone else committed the crime can not introduce evidence of "threats by a third person against the victim" unless this evidence is "coupled with other evidence having an inherent tendency to connect [this] other person with the actual commission of the crime".[5] In *Smithart*, the supreme court re-affirmed this rule:

[A] defendant may always generally suggest that someone other than the defendant is guilty of the charged crime. But when a defendant wishes to implicate a specific individual, evidence of the third party's guilt is admissible only if the defense can produce evidence that "tend[s] to directly connect such other person with the actual commission of the crime charged." This rule derives from considerations of relevance and materiality; as we explained in *Marrone v. State*, such an initial evidentiary showing is necessary because "if evidence of motive alone upon the part of

other persons were admissible ... in a case involving the killing of a man who had led an active and aggressive life[,] it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons" were possible suspects in the murder. In such a system, the resulting trial would be a confusing waste of judicial resources. The concerns voiced in *Marrone* have led virtually every state to. require some kind of preliminary evidentiary showing before allowing introduction of alternative-perpetrator evidence.

*Smithart*, 988 P.2d at 586–87 (footnotes omitted). This quoted passage focuses on evidence of another person's motive to commit the crime. But the supreme court also stated in *Smithart* that "[c]ourts generally agree that [the mere] opportunity [of another person to commit the crime] is an insufficient basis on which to admit alternative-perpetrator evidence". *Id.* at 588.

Thus, under the *Smithart–Marrone* rule, evidence of another person's motive to commit the crime, or evidence of another person's opportunity to commit the crime, standing alone, will not be admissible when offered to prove that this other person may have committed the crime. As both *Smithart* and *Marrone* state, this restriction on a criminal defendant's ability to introduce evidence of another person's potential guilt is based on the law's demand for relevance and materiality.

The *Smithart–Marrone* rule can be thought of as an issue-specific application of Evidence Rule 403. That is, *Smithart* and *Marrone* hold that evidence of another person's motive to commit the crime, or evidence of another person's opportunity to commit the crime, standing alone, is so speculative and carries so little probative weight that, even though this evidence might technically meet the test for relevance codified in Evidence Rule 401, the evidence can be excluded under Evidence Rule 403—the rule authorizing trial judges to exclude relevant evidence if its probative value is outweighed by its potential for confusing the issues, misleading the jury, or wasting time.

---

5. *Marrone*, 359 P.2d at 984.

But if the proposed evidence of another person's potential guilt exceeds this threshold, so that a reasonable fact-finder could conclude that the evidence raises a reasonable doubt concerning the defendant's guilt, then the defendant should be allowed to present the evidence. *Smithart,* 988 P.2d at 587, 588.

Moreover, the *Smithart–Marrone* rule is similar to Evidence Rule 404 in that it restricts the admission of certain evidence only when that evidence is offered for a particular purpose—here, the purpose of trying to show that some identified other person may have committed the crime.

Often, at a criminal trial, evidence that is relevant for other purposes may also tend to suggest the guilt of some third person. The *Smithart–Marrone* rule does not bar the admission of evidence simply because the evidence tends to suggest someone else's guilt. Rather, *Smithart* and *Marrone* limit a defendant's ability to offer evidence when the primary relevance of that evidence is to suggest someone else's guilt (until the defendant has made the requisite threshold showing of materiality).

This gloss on the *Smithart–Marrone* rule is implicit in the *Smithart* court's explanation of why the rule does not restrict a defendant's scope of argument to the jury:

[W]e agree with the court of appeals's conclusion that the trial court misconstrued *Marrone* when it prevented *Smithart's* attorney from arguing that DeForest was guilty. Nothing in *Marrone* limits an attorney from using an opening statement or closing summation to draw reasonable inferences about a third party's involvement from trial evidence. The court of appeals correctly explained that, under *Marrone, Smithart* should have been able to argue to the jury that DeForest was guilty of the charged crimes:

[T]he *Marrone* rule limits the introduction of evidence, but it does not limit a party's ability to argue all reasonable inferences from the evidence that is admitted. If, despite *Marrone's* restric-

tion on the introduction of independent evidence that DeForest committed the crime, it was clear that sufficient evidence would be introduced at *Smithart's* trial to warrant a reasonable inference that DeForest might be the perpetrator, then Smithart would be entitled to announce this inference in his opening statement.

*Smithart,* 988 P.2d at 589 (footnotes omitted).[6]

### (b) Cleveland's interpretation of Smithart

Cleveland argues that Judge Erlich violated *Smithart* when he prohibited Cleveland from offering hearsay testimony regarding Harry Morena's statements to the troopers about Morena's visits to Cleveland's house on the weekend of the sexual assault (November 17–19, 2000).

It is important to note, at the outset, that Cleveland's case does not present a typical *Smithart* problem. Judge Erlich never invoked the *Smithart–Marrone* rule to preclude Cleveland from offering evidence of another person's potential guilt. Nor did Judge Erlich invoke this rule to preclude Cleveland's attorney from openly accusing other people (Harry Morena, Mary Williams, and Dora Williams) of committing the crimes for which Cleveland was charged. In fact, the defense attorney leveled these accusations both in his opening statement and in his summation to the jury.

Cleveland's basic contention is that, once a defendant has met the minimum threshold of materiality specified in *Smithart,* the *Smithart* decision guarantees a defendant the right to introduce evidence tending to suggest another person's guilt, even when that evidence would otherwise be barred by the normal rules of evidence. Cleveland relies on the supreme court's statements in *Smithart* that "a defendant's right to present a defense is a fundamental element of due process", and that "evidentiary rulings [which] substantially infringe ... the right to

---

6. Quoting this Court's earlier decision in *Smithart v. State,* 946 P.2d 1264, 1281 (Alaska App. 1997).

present a defense ... violat[e][a] defendant's due process rights".[7]

Cleveland argues that if all of his various offers of proof are credited, those combined offers of proof contained enough information implicating Harry Morena as the perpetrator of the sexual assault on H.C. to satisfy *Smithart's* minimum threshold of materiality. From this, Cleveland concludes that he should have been allowed to introduce all of the information contained in those various offers of proof, even if this information was objectionable hearsay or was otherwise inadmissible under the normal rules of evidence.

■ Cleveland misunderstands *Smithart.* Although *Smithart* confirms a defendant's due process right to present a defense, the right to present a defense does not include the right to demand that the trial judge disregard the rules of evidence. In particular, this Court has held that a trial judge does not abridge a criminal defendant's right to present a defense when the judge applies the hearsay rules to exclude proposed defense testimony.

In *Garroutte v. State*, 683 P.2d 262 (Alaska App.1984), the defendant wished to introduce the statement of an unavailable co-defendant, Snyder. Snyder had pleaded guilty before Garroutte went to trial. During Snyder's interview with the probation officer assigned to prepare the pre-sentence report, Snyder admitted committing the crime, but he asserted that his accomplice had not been Garroutte, but rather a third person.[8]

When Garroutte learned of Snyder's statement to the probation officer, Garroutte asked his trial judge to allow hearsay testimony concerning Snyder's out-of-court statement. The trial judge acknowledged that Snyder's statement potentially fell within Evidence Rule 804(b)(3)'s exception for statements against penal interest, but the judge concluded that Snyder's statement lacked the circumstantial guarantees of trustworthiness required by Evidence Rule 804(b)(3).[9] The judge then ruled that, because Snyder's out-of-court statement was not admissible under any of the exceptions to the hearsay rule, Garroutte was barred from offering that statement into evidence.[10]

On appeal, this Court upheld the trial judge's ruling that Snyder's statement lacked sufficient circumstantial guarantees of trustworthiness to qualify for admission under Evidence Rule 804(b)(3). We then addressed Garroutte's claim that, even though Snyder's statement was inadmissible hearsay, Garroutte had a due process right to present this evidence anyway:

> Garroutte separately argues that exclusion of Snyder's statement violated his constitutional right to due process of law. He relies on *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In *Chambers,* the United States Supreme Court held that the due process clause was violated by mechanical application of a state law excluding statements against penal interest. The court reversed the defendant's conviction because he had been precluded from admitting an out-of-court statement that "afforded persuasive assurances of trustworthiness" and was "well within the basic rationale of the exception for declarations against interest." *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049, 35 L.Ed.2d at 313. [But the] standards of admissibility prescribed by Evidence Rule 804(b)(3) parallel the constitutional mandate of *Chambers.* ... Our holding that Snyder's statement was not clearly corroborated therefore controls Garroutte's constitutional claim.

*Garroutte,* 683 P.2d at 267.

*See also Bright v. State,* 826 P.2d 765, 771–72 (Alaska App.1992), rejecting another claim that a trial judge violated a defendant's right to due process when she barred the defense from offering inadmissible hearsay testimony regarding out-of-court statements made by

---

7. *Smithart,* 988 P.2d at 586.

8. *Garroutte,* 683 P.2d at 264–65.

9. Alaska Evidence Rule 804(b)(3) states that when "[a] statement tending to expose the declarant to criminal liability [is] offered to excul-

pate the accused", the statement "is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement".

10. *Garroutte,* 683 P.2d at 265.

co-defendants; *D'Antorio v. State*, 837 P.2d 727, 735–36 (Alaska App.1992), rejecting a claim that the trial judge violated the defendant's right to due process when the judge excluded inadmissible hearsay testimony offered by the defense; and *Balentine v. State*, 707 P.2d 922, 925–26 (Alaska App.1985), rejecting a similar claim.

In sum, Cleveland is wrong when he argues that *Smithart* gives defendants the right to override the normal rules of evidence when they offer testimony tending to show that someone else committed the crime. The *Smithart* decision clarifies the rules under which a defendant may introduce testimony suggesting another person's guilt, but the supreme court's discussion of this point presumes that the offered testimony is in fact admissible under the rules of evidence. *Smithart* does not give defendants the right to introduce testimony or physical evidence that fails to qualify for admission under the rules of evidence.

Cleveland's attorney proposed to have Trooper Summey testify about Harry Morena's statements to another trooper (Trooper Terry), statements in which Morena described his visits to Cleveland's house on Saturday, November 18, 2000. This proposed testimony was clearly hearsay. Cleveland argued that this hearsay testimony was admissible under the residual exception codified in Evidence Rule 804(b)(5), but the record shows that much of the same information was available through the testimony of other witnesses, and Judge Erlich concluded that Morena's out-of-court statements lacked the circumstantial guarantees of trustworthiness required by Rule 804(b)(5).

Cleveland does not actually dispute the ruling that the offered hearsay failed to meet the criteria for admission under Rule 804(b)(5). Moreover (as explained above), we have reviewed the record and we conclude that Judge Erlich's ruling was not an abuse of discretion. Cleveland tries to circumvent Judge Erlich's ruling by arguing that *Smithart* makes the hearsay rules irrelevant. It does not.

Accordingly, we uphold Judge Erlich's decision to exclude the offered hearsay testimony.

*The trial judge's ruling concerning the chair leg: Cleveland's attempt to introduce this piece of physical evidence under the theory that it was the instrument that was used to sexually penetrate H.C. during the November 2000 sexual assault*

As noted earlier, Harry Morena was charged with assaulting his sister, H.C., with a chair leg at the end of May 2001 (about two weeks before Cleveland's first trial).

On June 8, 2001 (*i.e.*, the week before Cleveland's first trial), Trooper Summey interviewed Morena about this incident. During this interview, Morena admitted to Trooper Summey that he went to a gathering at H.C.'s house late in the evening of May 26th. Several people were there, drinking home brew. H.C. and Morena got into an argument: according to Morena's statement to Trooper Summey, H.C. was angry at him for taking her four-wheeler without permission and damaging some of her property. It is unclear from Trooper Summey's description of the conversation whether Morena admitted that he had done these things, or whether Morena was merely saying that he and H.C. argued because she accused him of doing these things.

In any event, during this argument, Morena punched H.C. in the eye, and she went into her bedroom and closed the door. Morena then removed one of the legs from the wooden chair that he was sitting on; he walked into H.C.'s bedroom and hit her over the head a few times with the chair leg. After the assault was reported, the troopers discovered this chair leg in H.C.'s residence, next to her bed.

According to the testimony and the attorneys' descriptions of the chair leg, the chair leg weighed "a couple of ounces" and, at its widest, had a diameter of one and a half inches or less.

During the evidentiary hearing that was held at Cleveland's first trial, the defense attorney asserted that this chair leg was the same instrument that had been used to sexually penetrate H.C. during the sexual assault at Cleveland's house in November 2000. Judge Erlich replied that he was not sure that there was a sufficient foundation to es-

tablish the relevance of the chair leg for that purpose.

The next day (June 14, 2001), the parties returned to court for a continuation of the evidentiary hearing. Soon after the hearing started, Cleveland's attorney announced that he intended to seek admission of the chair leg as a piece of physical evidence.

Judge Erlich asked the defense attorney how the chair leg could have been the object used in the sexual assault, when the doctor who examined and repaired H.C.'s injuries had testified that those injuries were caused by an object that was six inches in diameter. The defense attorney replied that the doctor had said that H.C.'s injuries could have been inflicted with a smaller-diameter object if greater force was used. Based on that testimony, the defense attorney took the position that there was no minimum size for the object—and thus the one-and-a-half-inch chair leg could have been used during the sexual assault.

The parties have given us a very limited record of Cleveland's first trial—and, in the few dozen pages of record that we have, Judge Erlich never ruled on the defense attorney's motion to admit the chair leg. However, it appears that Judge Erlich denied the motion—because the defense attorney renewed the motion at Cleveland's second trial in September 2001.

Cleveland's second trial began on September 11, 2001. Because all civil aviation was canceled that day (thus preventing out-of-town witnesses from attending the trial), the prosecutor and the defense attorney gave their opening statements, and then the jury was excused for the rest of the day. The defense attorney took this opportunity to renew his request for admission of the chair leg.

Based on the facts described above (i.e., the evidence that Morena beat H.C. with the chair leg during the assault at H.C.'s house on May 27, 2001), Cleveland's attorney argued that Morena must have used the same chair leg (or a nearly identical object) to sexually assault H.C. at Cleveland's house six months before, in November 2000.

Judge Erlich noted that the chair leg was much thinner than the object described in the doctor's testimony from Cleveland's first trial. But more important, Judge Erlich thought, was the fact that the chair leg was found at H.C.'s house in May 2001—i.e., it was found at another location six months after the sexual assault committed at Cleveland's house. In other words, the defense attorney's theory of relevancy depended on several unlikely assertions: that Morena had removed the chair leg from H.C.'s house in November 2000, that Morena took the chair leg to Cleveland's house and used it commit the sexual assault on H.C., and that Morena then returned the chair leg to H.C.'s house and re-fitted it to the chair—so that Morena could sit on that chair when he visited H.C.'s house in May 2001, and so that he could again remove the leg from the chair and use it as a weapon when he got into the argument with H.C. at the end of May 2001.

Judge Erlich concluded that the defense attorney's theory of relevance was "too speculative" to support a reasonable conclusion that this chair leg was the instrument used to sexually penetrate H.C. at Cleveland's house in November 2000. For this reason, Judge Erlich ruled that the defense attorney had failed to establish a sufficient foundation to support a finding that the chair leg was relevant, and he therefore denied the defense request to introduce the chair leg into evidence.

The next day (September 12, 2001), testimony began at Cleveland's second trial. The first government witness was Dr. Frances R. Wilson, the surgeon who evaluated H.C.'s injuries and operated on H.C. to repair them. Dr. Wilson's testimony supported Judge Erlich's ruling regarding the chair leg.

Dr. Wilson testified that H.C. had a laceration that went "way up into her rectum, . . . all the way through the muscle, . . . and into the fat around the rectum." This laceration was between four and six inches in length— that is, it penetrated four to six inches into H.C.'s body. Dr. Wilson concluded that this injury was caused by somebody forcibly pushing an object into H.C.'s rectum. Judging from the nature and extent of the injury, Dr. Wilson concluded that this object was at

least the diameter of a baseball bat, or even bigger—as large as four to six inches in diameter.

In follow-up questioning, Dr. Wilson specifically rejected the suggestion that this injury could have been caused by a man's penis. She reiterated that the object had to have been "about four inches in diameter".

The defense attorney engaged in relatively brief cross-examination of Dr. Wilson. (This cross-examination covers only four pages of transcript.) For present purposes, the salient aspect of that cross-examination is that the defense attorney never questioned Dr. Wilson's assertion that the object which inflicted H.C.'s injury had to have been at least approximately four inches in diameter.

■ Based on Dr. Wilson's testimony, and on the physical dimensions of the chair leg, and on the fact that this chair leg was attached to a chair in H.C.'s house on the evening of May 26–27, 2001 (i.e., six months after the sexual assault at Cleveland's house), Judge Erlich did not abuse his discretion when he ruled that no reasonable fact-finder could conclude that this same chair leg was the instrument used to sexually penetrate H.C. at Cleveland's house in November 2000. Accordingly, we uphold Judge Erlich's ruling that Cleveland failed to establish the relevance of the chair leg.

Cleveland's brief to this Court contains scattered sentences in which he continues to argue the relevance of the chair leg. For example, on page 11 of his brief, Cleveland asserts that the chair leg "was ostensibly similar to the instrument [used during the sexual assault]". Likewise, on page 17 of the brief, Cleveland asserts that the chair leg "could have been used to cause the laceration to [H.C.'s body]". Neither of these assertions is supported by the record.

In addition, Cleveland relies on the same construction of Smithart that we discussed in the previous section of this opinion: the argument that Smithart allows a defendant to circumvent the normal rules of evidence if the defendant wishes to argue that someone else might have committed the crime. This is not what Smithart stands for.

*The trial judge's ruling concerning evidence of Morena's May 2001 assault on H.C.: Cleveland's attempt to introduce evidence of this assault to prove Morena's propensity to commit assault*

The final issue raised in this appeal arises from Judge Erlich's refusal to allow Cleveland to introduce any evidence that Harry Morena assaulted H.C. with the chair leg in May 2001. At some point either just before Cleveland's first trial or during the early stages of that first trial, Judge Erlich ruled that Cleveland could not offer evidence of Morena's assault on H.C. on May 27, 2001. We do not have a record of that ruling, but Cleveland's attorney refers to the ruling during the evidentiary hearing of June 13, 2001 (i.e., in the middle of Cleveland's first trial). At that June 13th hearing, the defense attorney asked Judge Erlich to reconsider this issue.

In addition to trying to get the chair leg itself into evidence, Cleveland's attorney also wanted to call Morena to the stand to question him about the May 27th assault. After Morena invoked his privilege against self-incrimination and became unavailable as a witness, the defense attorney offered the testimony of Trooper Summey. Summey was prepared to testify that, when he interviewed Morena on June 8, 2001 (that is, just five days before the evidentiary hearing), Morena confessed to beating his sister H.C. with the chair leg during an argument at her house on the evening of May 26–27, 2001.

The State did not object to this proposed testimony on hearsay grounds (apparently because Morena's statements were so clearly against his penal interest). However, the State argued that Cleveland was not entitled to introduce *any* evidence of the May 27th assault. The State contended that the proposed evidence was barred by Evidence Rule 404(b)(1), because it was evidence of a bad act committed by Morena offered to prove his propensity to commit similar bad acts.

When the defense attorney responded that the May 2001 assault was relevant to show Morena's "motive", the prosecutor objected that it was impossible for a later event (i.e., the May 2001 assault at H.C.'s house) to provide the motive for an earlier event (i.e.,

the November 2000 sexual assault at Cleveland's house). As a matter of logic, this is true, but it misses the point. Cleveland's attorney was not arguing that Morena was motivated to sexually assault H.C. in November 2000 *because* of something that happened six months later, in May 2001. Rather, the defense attorney argued that both the May 2001 assault and the November 2000 sexual assault were *manifestations* of the same underlying "motive"—by which the defense attorney actually meant "trait of character".

Responding to the prosecutor's objection, the defense attorney clarified his position for Judge Erlich:

> *Defense Attorney:* [I concede that the prosecutor] has a point about ... chronology. [But I'm] not talking about a motive as we typically understand [that term]. [I am] talking about a motive to physically harm someone. And that motive to physically harm someone is, for lack of a better phrase, cruelty [or] meanness [or] willingness to see someone suffer. I am asserting that these two incidents [*i.e.,* the May 2001 assault with the chair leg, and the sexual assault in November 2000] establish [Morena's] cruelty, meanness, willing[ness] to see someone suffer. And ... the fact that [the victims] are the same [person] increases the motive—because a person who is willing to be cruel and [to] hurt a person [at] time A, whenever that takes place, ... a person who is willing to do that is presumably willing to cause injury and pain and [to] be cruel to that same person at time B. That's [my argument].

On one level, the defense attorney's argument for admission of this evidence is clearly inconsistent with Evidence Rule 404(b)(1). Rule 404(b)(1) bars the introduction of specific instances of a person's "cruelty", "meanness", or "willingness to see someone suffer" when this evidence is offered to prove the person's general propensity to be cruel, to be mean, or to inflict suffering on other people.

However, the defense attorney also noted that the victim of both assaults was the same person. In fact, during one of the defense attorney's other statements to Judge Erlich, he expressly drew an analogy to Evidence Rule 404(b)(4)—the rule that authorizes the admission of a defendant's other acts of domestic violence in a prosecution for a crime of domestic violence. That is, the defense attorney was arguing that he should be able to introduce evidence of Morena's act of domestic violence (his assault on H.C. in May 2001) for the purpose of showing that Morena had a propensity to commit acts of domestic violence against H.C.—and, thus, that Morena had possibly committed the sexual assault at Cleveland's house in November 2000.

Judge Erlich understood that the defense attorney was arguing that the incident of May 2001 was relevant to show that Morena characteristically engaged in domestic violence against his sister, H.C. And the judge rejected the prosecutor's position that a subsequent act could never reveal the motive behind a prior act. However, Judge Erlich declared that he did not believe the defense attorney had demonstrated a sufficient connection between the May 2001 assault and the November 2000 sexual assault:

> *The Court:* As [the defense attorney] noted, the DV rule [*i.e.,* Evidence Rule 404(b)(4)] doesn't talk about 'prior' or 'subsequent' act[s]. [But] as we all recognize, it's really unusual for a subsequent act ... to relate back. [The defense attorney] says [that the relevance of the May 2001 assault] is not motive, quite; [rather,] it goes to cruelty, and [that] it's not propensity. And here's what my problem is: I don't think [that], standing by itself, the May 2001 incident is relevant unless there [is] something prior to establish its relevance. I mean, that's the way I see it.... [There] would [have to] be something more.

A few minutes later, the defense attorney asked for clarification of the judge's ruling:

> *Defense Attorney:* I want to clarify [my understanding of your ruling]. You have found that the May [2001] incident involving Mr. Morena and [H.C.] is irrelevant because there appears to be no relation between the May incident and the November incident, is that correct?
>
> *The Court:* That's partially correct.... The argument that something happens after something [else], and it relates back [to

the earlier event], is an argument that's difficult to make in the law[.] ... To argue that the incident that [occurred] in May of 2001 is relevant to the issues in this trial, you'd at least need to [establish] a predicate of some prior kind of interaction between Mr. Morena and [H.C.] that would fall within the [domestic violence category], okay? That's where I'm coming from. [Does that] clarif[y] it?

  *Defense Attorney:* That does.

In effect, Judge Erlich told the defense attorney, "Show me more. I am not convinced that the single assaultive incident of May 27, 2001 proves that Morena characteristically commits acts of domestic violence against H.C. If you bring me additional evidence of a pattern of domestic violence, I will reconsider my ruling."

For purposes of the present appeal, it is important to remember that Judge Erlich made this ruling during the middle of Cleveland's *first* trial. This first trial ended in a mistrial, leading to Cleveland's second trial (and the convictions which he now appeals). Thus, the defense attorney had two opportunities (the remainder of Cleveland's first trial, and the entirety of Cleveland's second trial) to present the evidentiary foundation that Judge Erlich had asked for—evidence of other acts of domestic violence.

The defense attorney could have asked H.C. about these matters. Indeed, the record shows that this entire evidentiary discussion and ruling took place while H.C. was on the witness stand at Cleveland's first trial. After Judge Erlich issued the ruling that we have just quoted, the defense attorney announced that he intended to finish his cross-examination of H.C., and that he wanted to reserve the right to recall H.C. during the defense case so that he could ask her about other incidents between herself and Harry Morena—*i.e.,* so that he could establish the domestic violence predicate that Judge Erlich asked for.

We note, moreover, that most of the witnesses who testified at Cleveland's trial (all of them except Dr. Wilson and the state troopers) were residents of the small village of Ambler, and many of these witnesses were related to each other. They were presum-ably acquainted with each other's domestic affairs, and they might have provided information about the relationship between H.C. and Morena even if H.C. herself was reticent on this topic.

We have no transcript of the testimony from Cleveland's first trial, so we do not know if Cleveland's attorney pursued the question of other acts of domestic violence during the remainder of that first trial. But we do have a transcript of Cleveland's second trial. And at the second trial, the defense attorney did not question H.C. about her relationship with Morena, nor did he ask any other witness about this topic.

In particular, the defense attorney did not ask H.C. to describe any prior incidents in which Morena acted violently toward her or physically abused her, nor did the defense attorney ask H.C. about any other prior incidents that might have created ill-will between herself and Morena. Not only did the defense attorney fail to ask H.C. about these matters, but he did not ask any other witness about these matters, and he made no other offer of proof about these matters.

From the defense attorney's silence on this issue, from his failure to try to establish the foundational predicate that Judge Erlich had asked for, we can only conclude that the defense attorney had no further evidence of domestic violence or animosity between Morena and H.C.

Judge Erlich did not irrevocably shut the door on the defense attorney's effort to introduce evidence of Morena's May 2001 assault on H.C. with the chair leg. Instead, Judge Erlich told Cleveland's attorney that he was not convinced that this single incident proved that Morena characteristically engaged in this type of behavior, but he was willing reconsider the admissibility of the May assault if the defense attorney offered evidence of some other incident of domestic violence between H.C. and Morena.

Given Judge Erlich's ruling, Cleveland's attorney was obviously motivated to offer this additional evidence if it had existed. But he did not offer it—even though Morena's statement to Trooper Summey clearly suggested that there had been at least one

prior incident in which Morena took H.C.'s four-wheeler and damaged some of her property. Indeed, on pages 13–14 of his brief to this Court, Cleveland's attorney refers to this aspect of Morena's statement. Cleveland's attorney declares that "[i]t is instructive to note that the record is incomplete about the timing of the thefts and destruction of H.C.'s property by Morena".

The fact that the record contains no clarification of these matters may indeed be "instructive", but probably not in the sense Cleveland's attorney intended. The defense attorney was on notice that this evidence was needed, and he had a full opportunity to ask H.C. (or any other resident of Ambler) about these topics, and yet he did not. In fact, the record shows that Cleveland's attorney never asked Judge Erlich to revisit the question of whether the defense could offer evidence of Morena's May 27th assault on H.C. From this, the "instruction" we draw is that there was no admissible evidence of any other incidents of violence or abuse between Morena and H.C.

On appeal, Cleveland asserts (on page 14 of his brief) that the record presented to Judge Erlich "establish[ed] beyond any doubt a continuing pattern of victimization of H.C. by Morena". But this was precisely the assertion that Judge Erlich concluded had not been proved. In effect, Judge Erlich told the defense attorney that he was not convinced that a single act of violence (the May 27th assault) established a pattern of violence or abuse, or that it otherwise adequately supported the defense attorney's underlying assertion that Morena characteristically assaulted his sister.

Judge Erlich told Cleveland's attorney that if the defense could offer evidence of *any* prior incident of domestic violence, then he would be willing to re-assess the relevance and admissibility of the May 27th assault. But, as we have explained here, Cleveland's attorney offered nothing further.

We will assume, for purposes of argument, the validity of Cleveland's underlying contention that Alaska Evidence Rule 404(b)(4) might authorize the admission of evidence of domestic violence committed by people other than the defendant. But even if

we make that assumption, the question remains whether Judge Erlich abused his discretion when, in the absence of any further proof that there was a history of violence or abuse between Morena and H.C., the judge declined to allow Cleveland's attorney to offer evidence of the May 27th assault for the purpose of showing that Morena was characteristically abusive or violent toward H.C.

In *Bingaman v. State*, 76 P.3d 398 (Alaska App.2003), we cautioned that even though an act might qualify as "domestic violence" under the expansive definition codified in AS 18.66.990 (and incorporated by reference in Evidence Rule 404(b)(4)), trial judges must be vigilant to control the admission of other-crimes evidence under Rule 404(b)(4). Judges must carefully gauge whether the other crime that the State proposes to prove actually supports the inference for which it is offered under Rule 404(b)(4): the inference that a person who has committed this other crime is a person who characteristically engages in this type of crime, and is therefore more likely to have committed the crime being litigated. *Id.* at 412–13.

We note that there are many types of assault. The fact that a person has engaged in one type of assault might not necessarily be probative of that person's willingness or propensity to engage in another kind of assault. For instance, in *Carpentino v. State*, 38 P.3d 547, 553–54 (Alaska App.2002), we upheld a trial judge's ruling that the defendant's alleged sexual abuse of a male child was not sufficiently probative of his propensity to sexually abuse a female child to make this evidence admissible under Evidence Rule 404(b)(2). And in *Bingaman* itself, we pointed out that a defendant's willingness to engage in one sort of sexual assault might not necessarily be probative of the defendant's willingness to engage in another sort of sexual assault. *Bingaman*, 76 P.3d at 412.

In the present case, Cleveland wanted to offer evidence that Morena had gotten into an argument with his sister, H.C., and had beaten her over the head with a chair leg. Cleveland asserted that this evidence was relevant to the issue being litigated at his trial: the identity of the person who sexually

assaulted H.C. at Cleveland's house. But Judge Erlich was not required to unquestioningly accept the underlying premise of Cleveland's argument—the premise that if Morena was willing to beat his sister on the head with a stick on one occasion, then he was a person who characteristically assaulted his sister, and he therefore was more likely to have raped his sister in a manner likely to inflict severe internal injuries on her.

This is the same problem of relevancy that we discussed in *Bingaman:* the issue of whether it is reasonable to infer that a person who commits one kind of assault (here, a physical assault) is therefore more likely to commit a different kind of assault (sexual assault). Although reasonable judges might differ in their evaluations of this issue, we conclude that Judge Erlich did not abuse his discretion when he concluded that the defense attorney's proposed inference concerning Morena's character was not self-evident from the single incident of assaultive behavior in May 2001. Therefore, Judge Erlich did not abuse his discretion when he required Cleveland to offer some additional evidence of the relationship between Morena and H.C.—evidence suggesting that the May 27th assault was part of a pattern of domestic violence or abuse, or evidence otherwise suggesting that the May 27th assault was but one manifestation of an underlying antagonism between Morena and his sister—before he would allow Cleveland to introduce evidence of the May 27th assault and argue to the jury that this assault made it more likely that Morena was the perpetrator of the November 2000 sexual assault.

As we have explained, Cleveland offered no further evidence on this point. Accordingly, Judge Erlich did not abuse his discretion when he barred Cleveland from introducing evidence of the May 2001 assault.

As was true with respect to Judge Erlich's other evidentiary rulings, Cleveland again argues that *Smithart* gives him the right to introduce evidence of the May 2001 incident despite Judge Erlich's finding that this evidence was not relevant for the purpose that Cleveland offered it—*i.e.*, despite the judge's finding that the May 2001 incident, standing

alone, did not establish Morena's characteristic propensity to sexually assault his sister. But, as explained above, *Smithart* does not bar a trial judge from enforcing the rules of evidence against a defendant.

*Conclusion regarding Cleveland's attacks on his conviction*

For the reasons explained here, each of Judge Erlich's three challenged evidentiary rulings is supportable under the facts of the case and the governing law. We therefore uphold those rulings, and we accordingly affirm Cleveland's convictions.

*Cleveland's sentence appeal*

Cleveland was convicted of second-degree sexual assault (sexual penetration of an incapacitated person), second-degree assault (reckless infliction of serious physical injury), and manufacturing alcohol in a local option area. Both second-degree sexual assault and second-degree assault are class B felonies, while the offense of manufacturing alcohol in a local option area is a class C felony.[11]

Cleveland had previously been convicted of two felonies. In 1980, he was convicted of second-degree assault after he attacked someone with a screwdriver. And in 1985, Cleveland was convicted of first-degree sexual assault for raping his sister-in-law after an evening of drinking. Cleveland was sentenced to 15 years in prison for this sexual assault.

In addition to these felonies, Cleveland had several other convictions for assault between 1979 and 1985 (when he was imprisoned for the first-degree sexual assault). And he was convicted of two counts of fourth-degree assault in October 2000—*i.e.*, the month before the sexual assault in this case. Finally, the pre-sentence report contained an unrebutted allegation that Cleveland committed another rape in 1982, a crime that went unprosecuted because the victim did not report it.

Because Cleveland was a third felony offender for presumptive sentencing purposes, he faced a 6 year presumptive term for the second-degree sexual assault and second-degree assault convictions, and he faced a 3

---

11. *See* AS 11.41.420(b), AS 11.41.210(b), and AS 04.16.200(b).

year presumptive term for the manufacturing alcohol conviction.[12]

Judge Erlich found that the State had proved six aggravating factors under AS 12.55.155(c): (c)(1)—that Cleveland's victim sustained physical injury; (c)(4)—that Cleveland used a dangerous instrument in furtherance of the offense; (c)(5)—that Cleveland knew that the victim was particularly vulnerable; (c)(7)—that one of Cleveland's prior felonies was of a more serious class of offense than his present crimes; (c)(8)—that Cleveland's criminal history included aggravated or repeated instances of assaultive conduct; (c)(10)—that Cleveland's conduct in committing the physical assault was among the most serious within the definition of that offense, because Cleveland's conduct actually amounted to first-degree assault; and (c)(18)(B)—that Cleveland had committed another sexual assault involving the same or similar conduct.

Based on these aggravators, and based on Cleveland's extensive history of assaultive crimes, Judge Erlich concluded that isolation was the primary sentencing goal in Cleveland's case. He sentenced Cleveland to a composite term of 19 years' imprisonment for these three crimes.[13]

Judge Erlich recognized that, because Cleveland's sentence exceeded the 10-year maximum term of imprisonment that Cleveland could have received for his most serious offenses (the two class B felonies), the judge could not impose the 19-year sentence without finding that this length of imprisonment was necessary to protect the public. *See Neal v. State*, 628 P.2d 19, 21 (Alaska 1981); *Mutschler v. State*, 560 P.2d 377, 381 (Alaska 1977). However, the judge did make this finding, based on Cleveland's history of violence, violence that appeared to be most often triggered when Cleveland was drinking, and based on the fact that previous lengthy prison sentences had failed to deter Cleveland from further violent crimes.

In his brief to this Court, Cleveland concedes that he has "a history of violence", but he argues that his criminal history does not support Judge Erlich's decision to impose a composite sentence that is nearly double the maximum sentence for either of Cleveland's most serious crimes (the second-degree sexual assault and the second-degree assault).

Judge Erlich concluded that Cleveland's current crimes were aggravated, and the record supports this conclusion. Judge Erlich could also properly take account of Cleveland's lengthy history of violence and sexual assault. In addition, the judge could properly consider the fact that a previous lengthy prison sentence had failed to deter Cleveland from committing two more violent felonies.

■ We have previously upheld atypically lengthy prison sentences for defendants who committed apparently inexplicable acts of extreme violence.[14] While the cases in the accompanying footnote are homicide cases, we conclude that the same principle applies to Cleveland's case. Given Cleveland's status as a third felony offender, his lengthy history of assaults and sexual assaults, his failure to be deterred by previous prison sentences, and his apparently inexplicable decision to inflict severe injuries on the victim in this case, we conclude that Judge Erlich was not clearly mistaken when he imposed a sentence that exceeded the normal 10 year ceiling under the *Neal–Mutschler* rule.[15]

12. *See* AS 12.55.125(d)(2) and AS 12.55.125(e)(2).

13. On both the sexual assault and the physical assault convictions, Judge Erlich sentenced Cleveland to 10 years' imprisonment. The judge imposed 6 years of the physical assault sentence consecutively to the sexual assault sentence, for a total of 16 years to serve. In addition, Judge Erlich sentenced Cleveland to serve 5 years for manufacturing alcohol, of which 3 years were imposed consecutively to Cleveland's sexual assault and physical assault. Thus, Cleveland's total time to serve is 19 years.

14. *See Hamilton v. State*, 59 P.3d 760, 772 (Alaska App.2002); *Cheely v. State*, 861 P.2d 1168, 1178–1180 (Alaska App.1993); *Norris v. State*, 857 P.2d 349, 356–58 (Alaska App.1993); *Gustafson v. State*, 854 P.2d 751, 763–67 (Alaska App. 1993); *Monroe v. State*, 847 P.2d 84, 92–93 (Alaska App.1993); *Page v. State*, 657 P.2d 850, 853–55 (Alaska App.1983); *Faulkenberry v. State*, 649 P.2d 951, 956–57 (Alaska App.1982).

15. *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).

*Conclusion*

The judgement of the superior court is AFFIRMED.